IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

CHANNEN RAY OZELL SMITH,

Petitioner,

v.                                                        Case No. 24-CV-0077-SEH-MTS

MARGARET GREEN, Warden,

Respondent.

## OPINION AND ORDER

Petitioner Channen Ray Ozell Smith, a self-represented Oklahoma prisoner,[1] petitions for a writ of habeas corpus under 28 U.S.C. § 2254.  He asserts four claims challenging the lawfulness of his custody under the criminal judgment entered against him in Tulsa County District Court Case No. CF-2010-4461.  Respondent moves to dismiss the Petition, primarily asserting that Smith did not bring his claims within the one-year statute of limitations prescribed in 28 U.S.C. § 2244(d)(1).  Smith did not respond to the Motion to Dismiss, and the time to do so has expired.

---

[1] Because Smith appears without counsel, the Court construes the Petition with leniency.  *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  But the rule of liberal construction neither requires nor permits the Court to act as his advocate.  *Id.*; *see Childers v. Crow*, 1 F.4th 792, 798 (10th Cir. 2021) ("Although [the petitioner's] pro se petition before the district court is entitled to a liberal construction, we 'may not rewrite a petition to include claims that were never presented.'" (quoting *Barnett v. Hargett*, 174 F.3d 1128, 1133 (10th Cir. 1999))).

Having considered the Petition [ECF No. 1], the Motion to Dismiss and Brief in Support [ECF Nos. 13, 14], the record of state court proceedings [ECF No. 14 (attachments); ECF No. 15; ECF No. 16], and applicable law, the Court finds and concludes that the Motion to Dismiss shall be GRANTED in part and DENIED in part.

# Table of Contents

BACKGROUND ................................................................................................... 2

DISCUSSION ...................................................................................................... 6

  I. Legal background ......................................................................................... 7

    A. Statute of limitations ............................................................................. 8

    B. Exhaustion requirement and procedural default doctrine .......................... 9

  II. Analysis of procedural bars ........................................................................ 11

    A. Claim one, in part, is not cognizable and, in part, is procedurally defaulted ............ 12

    B. Claim four is procedurally defaulted and lacks merit ................................ 16

    C. Claims two and three are untimely. ....................................................... 19

    D. Conclusion ........................................................................................ 23

  III. Analysis of gateway actual innocence claim ............................................... 23

    A. Newly supplemented record ................................................................. 25

    B. Predicted impact on reasonable jurors .................................................. 84

    C. Conclusion ....................................................................................... 106

CONCLUSION .................................................................................................. 107

## *BACKGROUND*

Between 2:00 a.m. and 2:35 a.m. on Saturday, October 23, 2010, Tulsa police officers responded to a shooting at 1843 North Harvard Avenue.  ECF No. 15-2 at 31-32, 73; ECF No. 15-3 at 190-91; ECF No. 15-5 at 81 (Def's Ex.

1);[2] ECF No. 15-6 at 43.[3]   Officers saw emergency medical technicians treating two victims, Dominique Jasper and Carlameisha Jefferson,[4] outside the house; both victims were transported by ambulance to St. John's Hospital.  ECF No. 15-2 at 32; ECF No. 15-5 at 81-82; ECF No. 15-7 at 43. Jasper had been shot once in the back of the head, once in the lower lumbar region of his back, and once in the left wrist.  ECF No. 15-5 at 82; ECF No. 15-7 at 56.  One bullet penetrated Jefferson's upper left arm and exited into her side chest area; she also had a through and through gunshot wound on her left forearm.  *Id.*; *see also* ECF No. 15-5 at 41-44 (State's Exs. 42, 45, 46, 47).  Brandon Savage and his fiancé, Lovely Harris, both of whom lived at the house and were home during the shooting, described the shooter as an approximately six-foot-tall black male dressed in all black.  ECF No. 15-5, at

---

[2] Defendant's Exhibit 1 was not admitted at trial, but it is part of the state court record.  *See* ECF No. 15-5 at 80; ECF No. 15-2 at 40-41.  In this Background section, the Court includes facts from this exhibit and from other police reports that are included in the state court record, regardless of whether those reports were admitted at trial, to provide helpful context for the trial evidence further explored in Discussion section III.B.

[3] For consistency, the Court's citations refer to the CM/ECF header pagination.

[4] In portions of the record, several individuals are referred to by "street names" or nicknames.  *See* ECF No. 14-4 at 9-17; 15-2 at 77, 140, 145; ECF No. 16 (State's Ex. 1).  Unless a street name is referenced in a direct quote or is otherwise relevant, the Court refers to each individual, in the first instance, by his or her full legal name and, thereafter, by last name.  If necessary to avoid confusion with shared last names, the Court indicates when it will refer to an individual by his or her first name.

81-82. At the hospital, Jasper and Jefferson provided that same description to Sergeant Larry Bayles, Jr. ECF No. 15-3 at 193, 195. When Savage arrived at the hospital, he told Jasper's mother, Phyllis Jasper ("Phyllis"), and Jasper's girlfriend, Kisha Brown, that "Cross" was the shooter. ECF No. 15-2 at 227-28, 265-68; ECF No. 15-7 at 56. Detective S.E. Hickey learned through investigation that Smith is known by the name "Cross." ECF No. 15-7 at 56. Hickey presented a photograph of Smith to Brown, and Brown confirmed Smith was the person she and Jasper knew as Cross. *Id.* On November 8, 2010, Hickey interviewed Savage, and Savage identified Smith as the shooter from a six-person photographic lineup. ECF No. 15-6 at 43-45; ECF No. 15-7 at 56.

On November 15, 2010, Jasper died from complications related to his gunshot wounds, and the case was reassigned to a homicide detective, Detective Vic Regalado. ECF No. 15-3 at 5-7, 59, 68, 82. The next day, Regalado interviewed Savage, Savage again identified Smith as the shooter, and the State filed a felony information charging Smith with first-degree murder, for Jasper's death; shooting with intent to kill, for the shooting of Jefferson; and possession of a firearm after former conviction of a felony. ECF No. 15-6 at 33-34, 43-45. Detective Regalado interrogated Smith on

November 17, 2010.[5]  ECF No. 15-3 at 9, 31-35.  After waiving his *Miranda* rights,[6]  Smith denied involvement in the shooting, denied knowing Jasper and Jefferson by their legal names but identified them from photographs as people he knew, respectively, as "D-Loc" and "24," and told Regalado that he spent the weekend of the shooting in Claremore with his girlfriend, that he left Tulsa late Friday night, and that he returned to Tulsa sometime between 10 a.m. and noon on Saturday.  *Id.* at 10-15, 33-38, 42; ECF No. 16 (State's Exhibit 1).

Following a preliminary hearing,[7] the State filed an amended felony information charging Smith with first-degree murder, shooting with intent to kill, possessing a firearm after former conviction of a felony, and discharging a firearm at an occupied dwelling.  ECF No. 15-6 at 74.  Smith's case was tried to a jury in January 2013, and the jury found him guilty as charged. ECF No. 14-1 at 2. The jury recommended sentences of life imprisonment, twenty years' imprisonment, ten years' imprisonment, and ten years' imprisonment.  ECF No. 15-4 at 132-33, 150, 175, 199-200.  The trial court

---

[5] Detective Regalado testified at trial, "It was an interrogation, absolutely."  ECF No. 15-3 at 31.

[6] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

[7] Respondent did not provide the Court with the transcript of the preliminary hearing.

sentenced Smith according to the jury's recommendations and ordered that he serve the twenty-year and ten-year terms concurrently, each with the other, and serve the twenty-year term consecutively to the life term.  ECF No. 15-7 at 185-98.

Smith appealed, and the Oklahoma Court of Criminal Appeals ("OCCA") affirmed Smith's convictions and sentences in June 2014.  ECF No. 14-1. Smith did not seek further direct review.  ECF No. 1 at 3.  Smith first sought postconviction relief more than eight years later, in October 2022.  ECF Nos. 14-4, 14-5.  The state district court denied the application, Smith appealed, and the OCCA affirmed the state district court's decision in April 2023.  ECF Nos. 14-6, 14-7.

Smith filed the Petition on February 20, 2024.[8]  ECF No. 1 at 1, 17.

## *DISCUSSION*

In the Petition, Smith asserts three claims that he presented to the OCCA through his postconviction appeal:  (1) "newly discovered evidence" (claim one); (2) "ineffective assistance of appellate counsel" (claim two); and (3)

---

[8] The Clerk of Court received the Petition on February 22, 2024, but the Court deems it filed on February 20, 2024, the date Smith declares, under penalty of perjury, that he gave the Petition to prison officials for mailing. ECF No. 1 at 17; *see* Rule 3(d), *Rules Governing Section 2254 Cases in the United States District Courts*.

"*Brady* violation"[9] (claim three).  ECF No. 1 at 5-9, 40, 60-69.  He also presents one new claim:  "newly discovered evidence state-courts lack jurisdiction to prosecute on tribal lands i[s] a due process violation of federal laws enacted by Congress" (claim four).  *Id.* at 12.  Respondent contends that all four claims are barred by the one-year statute of limitations prescribed in 28 U.S.C. § 2244(d)(1).  ECF No. 14 at 20-34.  Respondent further contends that claim one is not a cognizable habeas claim, under 28 U.S.C. § 2254(a); and that claim four is unexhausted, *see* 28 U.S.C. § 2254(b)(1)(A), and lacks merit.  *Id.* at 22-23, 31-34 & n.19.

## I. Legal background

A federal court may grant habeas relief to a state prisoner only if the prisoner shows that his custody violates (1) the United States Constitution, (2) federal law, or (3) treaties of the United States.  28 U.S.C. § 2254(a); *see Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (explaining that "it is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts").  Even when a state prisoner presents cognizable federal claims, the habeas provisions of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") and the

---

[9] *See Brady v. Maryland*, 373 U.S. 83 (1963).

United States Supreme Court's interpretation of those provisions tightly

constrain a federal court's discretion to grant relief.  Three constraints are

relevant here:  the statute of limitations, the exhaustion requirement, and

the procedural default doctrine.

## A. Statute of limitations

In most cases, a state prisoner must file a federal habeas petition within

one year of the date his or her state criminal judgment becomes final on the

conclusion of direct review.  28 U.S.C. § 2244(d)(1)(A); *Gonzalez v. Thaler*, 565

U.S. 134, 150 (2012).  In some cases, a state prisoner can show that some

event other than the finality of the judgment triggered a later commencement

date for the limitations period.  28 U.S.C. § 2244(d)(1)(B)-(D).  Different

claims raised in the same petition may implicate different triggering events

and, thus, may provide different limitations periods.  *See Prendergast v.

Clements*, 699 F.3d 1182, 1187 (10th Cir. 2012) (explaining that "§ 2244(d)(1)

should be applied on a claim-by-claim basis").

Regardless of which event triggers the limitations period, that period is

tolled for "[t]he time during which a properly filed application for State post-

conviction or other collateral review with respect to the pertinent judgment or

claim is pending."  28 U.S.C. § 2244(d)(2).  To qualify for statutory tolling, the

petitioner must seek postconviction relief or other collateral review in state

8

court before the applicable federal limitations period expires. *See Clark v. Oklahoma*, 468 F.3d 711, 714 (10th Cir. 2006). In addition, because the statute of limitations is not jurisdictional, a court may toll the limitations period for equitable reasons, *Holland v. Florida*, 560 U.S. 631, 645 (2010), and may excuse noncompliance with the limitations period based on "a credible showing of actual innocence," *McQuiggin v. Perkins*, 569 U.S. 383, 386, 392 (2013).

### B. Exhaustion requirement and procedural default doctrine

Ordinarily, a state prisoner must exhaust available state remedies, before filing a federal habeas petition, by fairly presenting the substance of his federal claims to the highest state appellate court in accordance with applicable state procedural rules. 28 U.S.C. § 2254(b)(1)(A); *see O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) ("[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."); *Prendergast*, 699 F.3d at 1184 (noting that "the crucial inquiry" in an exhaustion analysis is "whether the 'substance' of the petitioner's claim has been presented to the state courts in a manner sufficient to put the courts on

notice of the federal constitutional claim" (quoting *Picard v. Connor*, 404 U.S. 270, 278 (1971))).[10]

If a state prisoner presents an unexhausted claim in federal court, the court may dismiss the claim without prejudice, so the prisoner can pursue available state remedies, or may impose an anticipatory procedural bar if the court anticipates that "the state court would now find the claim[] procedurally barred on independent and adequate state law grounds." *Grant v. Royal*, 886 F.3d 874, 891-92 (10th Cir. 2018) (quoting *Smallwood v. Gibson*, 191 F.3d 1257, 1267 (10th Cir. 1999)).  If, and only if, a federal court determines that all claims in a petition should be denied on the merits, a federal court may apply § 2254(b)(2) and deny an unexhausted claim on the merits "notwithstanding" the prisoner's failure to exhaust available state remedies.  *Moore v. Schoeman*, 288 F.3d 1231, 1234-35 (10th Cir. 2002).

A claim that is subject to an anticipatory procedural bar is procedurally defaulted for purposes of federal habeas review.  *Dulin v. Cook*, 957 F.2d 758,

---

[10] Exhaustion is not required if the state prisoner shows either (1) that "there is an absence of available State corrective process"; or (2) that "circumstances exist that render such process ineffective to protect the rights of the applicant."  28 U.S.C. § 2254(b)(1)(B).  As evidenced by Smith's state postconviction proceedings, Oklahoma has a corrective process.  And, though that process proved unsuccessful for him, Smith does not argue that the process itself is ineffective to protect his rights.

759 (10th Cir. 1992). A federal court may not review a procedurally defaulted
claim "unless the prisoner can demonstrate cause for the procedural default
and actual prejudice as a result of the alleged violation of federal law, or
demonstrate that failure to consider the claims will result in a fundamental
miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).
Under the miscarriage of justice exception, a claim of "actual innocence, if
proved, serves as a gateway through which a petitioner may pass whether
the impediment is a procedural bar . . . or . . . expiration of the statute of
limitations." *Perkins*, 569 U.S. at 386.

## II. Analysis of procedural bars

Smith contends his claims are timely under either § 2244(d)(1)(A) or §
2244(d)(1)(D). ECF No. 1 at 15-16. He concedes he did not present claim four
to the OCCA, but he argues that this claim presents a "federal question" that
need not be presented in state court. *Id.* at 12-13. Smith also urges this
Court to apply the miscarriage of justice exception to excuse the untimeliness
of any claims because he submits newly discovered evidence of actual
innocence, i.e., affidavits he obtained from four individuals implicating Arlen
Young, who died in 2017, as the person who shot Jasper and Jefferson. ECF
No. 1 at 5-6, 15-16, 60-61; *see* ECF No. 14-4 at 9-17 (affidavits).

**A. Claim one, in part, is not cognizable and, in part, is procedurally defaulted.**

In claim one, Smith contends he was denied his Fourteenth Amendment right to due process, specifically, the "right of an innocent man to be freed from incarceration by reason of false testimony by witnesses called on behalf of the State," because "[c]ertain witnesses at [his] trial knowingly gave false or misleading testimony."  ECF No. 1 at 5-6, 60; *see Glossip v. Oklahoma*, 604 U.S. ___, ___ S. Ct. ___, 2025 WL 594736, at *10 (Feb. 25, 2025) (reiterating holding from *Napue v. Illinois*, 360 U.S. 264, 269 (1959), "that a conviction knowingly 'obtained through use of false evidence' violates the Fourteenth Amendment's Due Process Clause").  He alleges in claim one that he has "newly discovered evidence" of his innocence, specifically, the affidavits implicating Young as the shooter.  ECF No. 1 at 45-46, 49-51, 60-61, 66-67 (discussing newly discovered evidence); ECF No. 14-4 at 9-17 (affidavits).

Respondent construes claim one, in part, as asserting a substantive claim of actual innocence based on newly discovered evidence.  ECF No. 14 at 22-24.  Respondent argues claim one therefore not only is untimely but also is not a cognizable habeas claim.  *Id.*  To date, the Supreme Court has not recognized a freestanding claim of actual innocence as a basis for federal habeas relief.  *See Perkins*, 569 U.S. at 392 ("We have not resolved whether a

prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence."); *Herrera v. Collins*, 506 U.S. 390, 400 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."); *Farrar v. Raemisch*, 924 F.3d 1126, 1131 (10th Cir. 2019) ("The Supreme Court . . . has never recognized freestanding actual innocence claims as a basis for federal habeas relief.").  Put simply, even if Smith presents a convincing claim that he is factually innocent, existing case law does not permit the Court to grant him federal habeas relief *unless* he also demonstrates (1) that some constitutional error occurred in his state criminal proceeding, *Herrera*, 506 U.S. at 400; (2) that he has satisfied any applicable statutory preconditions to habeas relief, *Brown v. Davenport*, 596 U.S. 118, 122 (2022); and (3) that the constitutional error "had substantial and injurious effect or influence in determining the jury's verdict," *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).  To the extent claim one asserts a substantive actual innocence claim, that claim is not a cognizable habeas claim.

However, as Respondent recognizes, it is also reasonable to read claim one, in part and in conjunction with his invocation of the miscarriage of justice exception, as asserting a gateway actual innocence claim.  ECF No. 14

13

at 22-23, 37-44; *see Perkins*, 569 U.S. at 386 (holding "that actual innocence,
if proved, serves as a gateway through which a petitioner may pass whether
the impediment is a procedural bar . . . or . . . expiration of the statute of
limitations").  To the extent Smith relies on the newly discovered evidence he
submits in support of claim one to argue that he can overcome any procedural
barriers that may preclude relief on other constitutional claims, the Court
evaluates his gateway actual innocence claim, *infra*, in Discussion section III.

The Court also finds it reasonable to read claim one, in part, as asserting
a Fourteenth Amendment due process claim based on Smith's allegations
that he was denied "Due Process of Law . . . by reason of false testimony by
witnesses called on behalf of the State" and that "[c]ertain witnesses at [his]
trial knowingly gave false or misleading testimony."  ECF No. 1 at 60.
Though this part of claim one is not well developed, the Court liberally
construes Smith's pro se allegations as sufficient to assert a *Napue* claim.
*See Napue*, 360 U.S. at 269 (holding "that a conviction knowingly 'obtained
through use of false evidence' violates the Fourteenth Amendment's Due
Process Clause"); *Mooney v. Holohan*, 294 U.S. 103, 112 (1934) (rejecting a
"narrow view of the requirement of due process" and explaining that
requirement "cannot be deemed to be satisfied by mere notice and hearing if
a state has contrived a conviction through the pretense of a trial which in

truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured").

That said, and to the extent this Court's reading of claim one to include a *Napue* claim has deprived Respondent of the opportunity to assert procedural defenses as to that claim, the Court presumes that the *Napue* claim is untimely and unexhausted, that it is subject to an anticipatory procedural bar because the OCCA almost certainly would apply its well-established rule against successive postconviction claims if Smith were to return to state court to exhaust this claim, *see* Okla. Stat. tit. 22, § 1086, and that the *Napue* claim therefore is procedurally defaulted.[11]  *Grant*, 886 F.3d at 891-92; *Dulin*, 957 F.2d at 759.

In sum, the Court reads claim one as asserting:  (1) a non-cognizable substantive actual innocence claim that should be dismissed; (2) a gateway actual innocence claim; and (3) a procedurally defaulted *Napue* claim.

---

[11] Claims one, two, and three are the same claims that he presented in state postconviction proceedings.  The Court recognizes, however, that nothing in the record suggests that any state court understood claim one as asserting a *Napue* claim despite Smith's statements that he was denied "Due Process of Law . . . by reason of false testimony by witnesses called on behalf of the State" and that "[c]ertain witnesses at [his] trial knowingly gave false or misleading testimony."  ECF No. 1 at 60; ECF No. 14-4 at 3; ECF Nos. 14-6, 14-7.

**B. Claim four is procedurally defaulted and lacks merit.**

In claim four, Smith contends he was denied his Fourteenth Amendment right to due process because he has "newly discovered evidence [that] state courts lack jurisdiction to prosecute on tribal lands."  ECF No. 1 at 12, 21-36; *see Danforth v. Minnesota*, 552 U.S. 264, 271 (2008) ("Originally, criminal defendants whose convictions were final were entitled to federal habeas relief only if the court that rendered the judgment under which they were in custody lacked jurisdiction to do so."); *Yellowbear v. Wyo. Att'y Gen.*, 525 F.3d 921, 924 (10th Cir. 2008) ("Absence of jurisdiction in the convicting court is indeed a basis for federal habeas corpus relief cognizable under the due process clause.").

Respondent contends claim four either should be dismissed because it is untimely and unexhausted or should be denied because it is unsupported by any evidence suggesting Smith is Indian.  ECF No. 14 at 31-34 & n.19.  Smith concedes that he did not exhaust claim four.  ECF No. 1 at 12-13.  And, again, the Court finds that if Smith were to return to state court with this claim, it is highly likely that the OCCA would apply its procedural bar against successive postconviction claims.  *See* Okla. Stat. tit. 22, § 1086.  Claim four therefore is procedurally defaulted.  *Grant*, 886 F.3d at 891-92; *Dulin*, 957 F.2d at 759.  But because the Court agrees with Respondent that

claim four lacks merit, the Court declines to consider whether claim four also is untimely or whether Smith can overcome the procedural default through his gateway actual innocence claim. *See Smith v. Duckworth*, 824 F.3d 1233, 1242 (10th Cir. 2016) (explaining that if a "'claim may be disposed of in a straightforward fashion on substantive grounds,' this court retains discretion to bypass the procedural bar and reject the claim on the merits" (quoting *Revilla v. Gibson*, 283 F.3d 1203, 1210-11 (10th Cir. 2002))).

The Court understands claim four as asserting that the State lacked jurisdiction to prosecute Smith because he committed his crimes of conviction within the boundaries of the Muscogee Creek Nation Reservation. ECF No. 1 at 21-36. Smith appears to rely on provisions of one or more 19th Century treaties and case law dating back to the early 20th Century to support this claim. *Id.* But regardless of the legal basis of his Indian country jurisdiction claim, this claim requires him to show not only that he was prosecuted for crimes he committed in Indian country, but also that he is Indian for purposes of federal law. *See Oklahoma v. Castro-Huerta*, 597 U.S. 629, 633, 637 (2022) (holding that "the Federal Government and the State have concurrent jurisdiction to prosecute crimes committed by non-Indians against Indians in Indian country" and reaffirming that "[s]tates have jurisdiction to prosecute crimes committed by non-Indians against non-Indians in Indian

country" (citing *United States v. McBratney*, 104 U.S. 621 (1882)); *United States v. Prentiss*, 273 F.3d 1277, 1280 (10th Cir. 2001) (discussing two-prong test for determining Indian status that requires court to find that the individual (1) "has some Indian blood" and (2) "is recognized as an Indian by a tribe or by the federal government"). Smith makes passing references to descendants of African American Freedmen. *See, e.g.,* ECF No. 1 at 24 ("The area that is now the state of Oklahoma was named 'Indian Territory' by Congress during the 1830s and was set aside exclusively for Indians and Freedman (African Americans)."); *see Vann v. Kempthorne*, 534 F.3d 741, 744 (D. D.C. 2008) (discussing the Dawes Commission that was directed by Congress to "create membership rolls for . . . the Cherokee Nation" and stating, "[t]he rolls of the Cherokees were completed in 1907 and resulted in two lists: a 'Blood Roll' for native Cherokees, and a 'Freedman Roll' for former slaves and their descendants"). Smith points to nothing in the record suggesting, let alone showing, that he possesses any quantum of Indian blood or that he is recognized as an Indian by a federally recognized Indian tribe or the federal government. Even accepting as true that Smith's crimes were committed in Indian country, Smith has not shown that he is Indian. The Court thus finds that claim four should be denied on the merits, regardless of whether any procedural barriers would preclude relief.

**C. Claims two and three are untimely.**

In claim two, Smith contends he was deprived of his Fourteenth Amendment right to the effective assistance of appellate counsel because counsel did not adequately raise or brief certain issues, did not file a thorough reply brief, and operated under a conflict of interest because he and Smith's trial counsel worked for the Tulsa County Public Defender's Office. ECF No. 1 at 7-8, 52-54, 61-62, 67-68; *see Evitts v. Lucey*, 469 U.S. 387, 396 (1985) ("A first appeal as of right . . . is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney."). In claim three, Smith contends he was denied his Fourteenth Amendment right to due process because the prosecutor failed to disclose Jasper's complete medical records and information that Jefferson was a "registered" police informant—evidence that Smith contends could have been used to impeach trial witnesses. ECF No. 1 at 9-10, 54-56, 63-64, 68-69; *see Brady*, 373 U.S. at 87 (1963) (holding "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution"); *Fontenot v. Crow*, 4 F.4th 982, 1064, 1066 (10th Cir. 2021) (explaining that *Brady* "requires the State to disclose material exculpatory and impeachment

evidence regardless of whether a motion compelling such disclosure is filed or
granted" and obligates the government "to disclose favorable evidence when
it reaches the point of materiality, regardless of the defense's subjective or
objective knowledge of such evidence").

Smith contends claims two and three are timely under either §
2244(d)(1)(A) or § 2244(d)(1)(D).  ECF No. 1 at 15-16.  Respondent contends,
and the Court finds, that they are not timely under either provision.  ECF
No. 14 at 25-31.[12]

Applying § 2244(d)(1)(A), Smith's judgment became final in September
2014, ninety days after the OCCA affirmed that judgment on direct appeal,
giving Smith until September 2015 to file a timely habeas petition.  *Gonzalez*,
565 U.S. at 150; *Harris v. Dinwiddie*, 642 F.3d 902, 906 n.6 (10th Cir. 2011).
Smith cannot benefit from statutory tolling because he did not seek
postconviction relief in state court until October 2022.  *Clark*, 468 F.3d at
714.  Thus, claims two and three are untimely under § 2244(d)(1)(A).

---

[12] Respondent contends, and the Court agrees, that even a generous
reading of the Petition reveals no facts implicating the triggering events
described in § 2244(d)(1)(B) or (d)(1)(C) and no facts or arguments that would
support equitable tolling.  ECF No. 1, generally; *see* ECF No. 14 at 25-31, 34-
37.  The Court thus analyzes timeliness only under § 2244(d)(1)(A) and
(d)(1)(D).

Claims two and three also are untimely under § 2244(d)(1)(D). Under this provision, the limitations period begins on "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D). Section 2244(d)(1)(D)'s due-diligence requirement is an objective standard that requires a federal court to consider when a reasonably diligent petitioner could have discovered the factual predicate of the claim, not when the petitioner asserting the claim actually discovered the factual predicate of the claim. *Madrid v. Wilson*, 590 F. App'x 773, 776 (10th Cir. 2014) (unpublished).[13] Claim two is untimely because a reasonably diligent petitioner could have discovered appellate counsel's allegedly deficient performance, any resulting prejudice, and the alleged conflict of interest arising from counsel's employment status, at the very latest, in June 2014 when the OCCA issued its decision on direct appeal. Claim three is untimely because a reasonably diligent petitioner could have discovered the alleged nondisclosure of Jasper's medical records and Jefferson's alleged status as a "registered" informant, at the very latest, in January 2013 when Smith's trial ended. Before trial, Smith's trial counsel not only acknowledged receipt of

---

[13] The Court cites this unpublished decision, and other unpublished decisions herein, as persuasive authority. Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

over 2,000 pages of medical records from the State through discovery, ECF

No. 1 at 53, 55; ECF No. 15-6 at 107-08, 173-74, 189, but also identified a

potential defense witness who would testify, if called, about his review of the

medical records and resulting conclusions, including "what the records show

as to [Jasper's] statements, or ability to make statements" before his death.

ECF No. 15-7 at 20-22.  During trial, Jefferson's suspected role as an

informant was a key part of the State's case.  The prosecutor argued, and

presented evidence (including Smith's own interview statements) to support,

that Smith shot Jefferson because Smith believed she was a "snitch."  ECF

No. 15-2 at 19-20, 208-11; ECF No. 16, State's Ex. 1, at 15:00:17-15:00:32

(Smith's videotaped interview).[14]  Even assuming Smith only recently

discovered "evidence" to prove that Jefferson was a "registered" police

informant, the limitations period under § 2244(d)(1)(D) is triggered by the

discovery of facts pertinent to the petitioner's claim, not by the discovery of

evidence to support that claim.  In short, because the factual predicates of

claims two and three could have been discovered, respectively, no later than

June 2014 and January 2013, applying § 2244(d)(1)(D) to these claims would

make them untimelier than they are under § 2244(d)(1)(A).

---

[14] The citation for State's Exhibit 1 refers to the videotape's internal
time stamp, not the time shown on the application that plays the video.

**D. Conclusion**

Smith's procedurally defaulted Indian country jurisdiction claim (claim four) lacks merit and will be denied.  To the extent claim one asserts a substantive actual innocence claim, that portion of claim one will be dismissed for failure to state a cognizable habeas claim.  Smith's procedurally defaulted *Napue* claim (claim one), untimely ineffective assistance of appellate counsel claim (claim two), and untimely *Brady* claim (claim three) will be dismissed on procedural grounds unless the Court determines that Smith's gateway actual innocence claim is credible.

**III. Analysis of gateway actual innocence claim**

"When used to overcome procedural issues, 'a claim of "actual innocence" is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'"  *Fontenot*, 4 F.4th at 1029-30 (quoting *Herrera*, 506 U.S. at 404).  "To be credible, a claim of actual innocence requires a petitioner to present 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'"  *Id.* at 1031 (quoting *Schulp v. Delo*, 513 U.S. 298, 324 (1995)).  In this circuit, "new" evidence is any

evidence that was not presented at trial, regardless of whether that evidence was available at the time of trial or discovered after trial. *Id.* at 1031-33.

Evaluating the merits of a gateway actual innocence claim requires a federal court to consider the trial record as supplemented by the new evidence and to make a "holistic judgment about all the evidence and its likely effect on reasonable jurors applying the reasonable-doubt standard." *House v. Bell*, 547 U.S. 518, 539 (2006) (cleaned up). "Because a *Schlup* claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record." *Id.* at 538. In making that assessment, the court "must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *Id.* at 538 (cleaned up). In addition, the court "must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial" and "may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." *Schlup*, 513 U.S. at 332. And "the newly presented evidence may indeed call into question the credibility of the witnesses presented at trial" and thus may require the court "to make some credibility assessments." *Id.* at 330.

Ultimately, to pass through the gateway, the petitioner must "persuade[] the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 329.

## A. Newly supplemented record

Though it was not required to prove Smith's motive, if any, for the shooting, the State presented evidence:  (1) that Jefferson, Jasper, and Savage were involved in an altercation with Freddie Smith ("Freddie") at Comanche Park Apartments before the shooting and that Freddie is Smith's cousin; (2) that, immediately before the shooting, Smith accused Jefferson of being a snitch, generally, or of snitching on Freddie, specifically; and (3) that, immediately before the shooting, Smith and Jefferson traded insults because Jefferson had a brief relationship with Smith's then-girlfriend Sabrina Schrader, about four months before the shooting.[15]

---

[15] The prosecutor set the stage by telling the jury that Jefferson, Jasper, and Savage went to Comanche Park Apartments "on October 22, 2010" and got into an argument with "Freddie Smith, Channen Smith's cousin."  ECF No. 15-2 at 19.  The fight "escalated and escalated with Freddie Smith pulling a pistol and shooting," police were called, Freddie "ran off," and Freddie "ultimately ended up picking up a case because of it, a weapons charge."  *Id.* at 20.  According to the prosecutor, "a few hours later . . . early morning hours of October 23rd, 2010, here comes Channen Ray Ozell Smith at 1843 North Harvard," accusing Jefferson and Jasper of "snitching on [his] cousin," and, ultimately, shooting both Jefferson and Jasper.  *Id.*

Because Jefferson and Savage each testified about their roles in the altercation at Comanche Park Apartments and the North Harvard shooting, and Smith's new evidence addresses those same events, the Court's organizes and evaluates the newly supplemented record as follows. First, the Court discusses evidence presented at trial and Smith's new evidence regarding the altercation, evidence presented at trial and Smith's new evidence regarding the shooting, and evidence presented at trial regarding Smith's alibi. Then, the Court assesses how a reasonably instructed jury would react to the newly supplemented record.[16]

---

[16] The state district court and the OCCA considered Smith's new evidence in adjudicating his claim that he has newly discovered evidence of his actual innocence—a substantive state law claim. ECF Nos. 14-6, 14-7. A federal court ordinarily applies a deferential standard of review for claims decided on the merits by a state court. 28 U.S.C. § 2254(d). But that standard "has no application to a gateway innocence assertion." *Fontenot*, 4 F.4th at 1034. Nonetheless, when a federal court evaluates a gateway actual innocence claim, and a state court has made factual findings relevant to that claim, the federal court must presume that the state court's findings are correct unless the petitioner rebuts that presumption with clear and convincing evidence. *Id.* at 1034-35. 28 U.S.C. § 2254(e)(1). Having carefully reviewed the state court record, the Court finds that presumption is sufficiently rebutted because the state court decisions contain factual findings that are not supported by the trial record.

### 1. Altercation at Comanche Park Apartments

As a reminder, police officers responded to the shooting on North Harvard between 2:00 a.m. and 2:35 a.m. on Saturday, October 23, 2010. ECF No. 15-2 at 31-32, 73; ECF No. 15-3 at 190-91. Before Jasper died on November 15, 2010, Detective Hickey investigated the shooting. ECF No. 15-7, at 56. Brown, Jasper's girlfriend, told Hickey that the shooting could be related to an altercation at Comanche Park Apartments that occurred on October 22, 2010, and that involved Jefferson and Freddie. *Id.* Neither Hickey nor Brown testified at trial. The State presented evidence about the altercation through three witnesses: Jefferson, Savage, and Detective Regalado. Three of Smith's affiants— Freddie, Henderson Porter, and Tiffany Tanner— provide statements about the altercation.

### a. Old evidence

In October 2010, Jefferson and Jasper lived in Savage's house on North Harvard with Savage, Harris, and several of Savage's relatives. ECF No. 15-2 at 78-80, 187, 223, 259. Jefferson had gone to school with Savage and, at the time of the shooting, Jefferson was dating Savage's sister, Eisha Redricks

("Eisha R."),[17] and had lived at Savage's house for about a month.  *Id.* at 80-82, 187-88, 223.  Jefferson and Jasper had been friends for three or four years, and the two shared an interest in rap music.  *Id.* at 81-82.  Savage had known Jasper for about one month, and Jasper had been living at Savage's house for one or two weeks.  *Id.* at 187-88.  Jefferson, Jasper, and Savage each had prior felony convictions and, at the time of the shooting, all three were active members of the 107 Hoover Crips.  *Id.* at 79, 185, 209, 270.[18]

Sometime after 10:00 p.m. on Friday, October 22, 2010,[19] Jefferson, Savage, and Jasper left Savage's house, in Harris's red Dodge Intrepid, and drove to Comanche Park Apartments, an apartment complex then located near 36th and Peoria.  *Id.* at 82-84, 90-91, 94, 189-90.  Jefferson had occasionally lived in that apartment complex with friends.  *Id.* at 82-84.  According to Jefferson, the trio went to the apartment complex because she knew a woman named Eisha who lived there, Eisha was the mother of

---

[17] There are two women named Eisha referred to in the trial transcripts, only one is referred to by a first and last name, and that last name is shared by other individuals referred to in the case.  The Court thus refers to Eisha Redricks as "Eisha R." and the other woman as "Eisha."

[18] Savage testified he was a high-ranking member, an "O.G." or "original gangster," and that he could issue kill orders "if need be."  *Id.* at 185-86, 271-72.

[19] Because it is clear from the record that the shooting on North Harvard took place in the early morning hours of Saturday, October 23, 2010, the Court notes that October 22, 2010, would have been Friday.

Jefferson's godchildren, and Savage had expressed an interest in getting Eisha's phone number. *Id.* at 83.[20] Savage testified the trio had two reasons for going to the apartment complex: Savage "went to go meet with a female" because he wanted her to sell drugs for him; Jefferson "was going to meet with one of her exes." *Id.* at 189.

Jefferson and Savage differently described what they did when they arrived at the apartment complex. Jefferson testified that she parked the car and went into Eisha's apartment, while Savage and Jasper stayed in the car. *Id.* at 84, 90-91, 94. Jefferson and Eisha came outside a couple minutes later. *Id.* 84-85, 143. Savage testified that when they arrived at the apartment complex, they parked next to an SUV, and offered to sell marijuana to the occupants of the SUV.[21] *Id.* at 191. The unidentified occupants of the SUV questioned the quality of the marijuana, suggesting some people had been trying to pass off synthetic marijuana as higher quality marijuana. *Id.* Savage responded by suggesting that most people would know the difference,

---

[20] Jefferson later clarified that the Eisha who lived at Comanche Park Apartments was not Savage's sister, Eisha R. ECF No. 15-2 at 144.

[21] Savage testified that Jasper told the occupants of the SUV that "we" had marijuana to sell. ECF No. 15-2 at 191. But Savage also testified he did not have any drugs with him when he went to the apartment complex. *Id.* at 190, 250-51.

and the occupants of the SUV "said something smart." *Id.* Then, Savage, Jasper, and Jefferson went to speak to the unidentified "female" about selling drugs for Savage, "but she wasn't there," so they went to visit Jefferson's ex. *Id.* at 190. Savage did not know the ex's name, but Savage testified that he, Jasper, and Jefferson all went inside the apartment. *Id.* at 190-91.

Jefferson and Savage both testified that a fight ensued when they returned to the parking lot, but they differently remembered why the fight began. Jefferson testified that after she and Eisha walked out of Eisha's apartment, Jefferson saw "a group of guys out there, Freddie and his - - like five of his home boys." *Id.* at 84-85, 143. Jefferson had known Freddie for about one year, from when she lived at the apartment complex, and she identified Freddie as Smith's "cousin." *Id.* at 85. As Jefferson walked to the car, Freddie "started cussing" at her because she, Freddie, and Smith "had little altercations or incidents before over Sabrina [Schrader]." *Id.* at 85-86. Jefferson testified that Freddie called her a "bitch," and Savage got out of the car and told Freddie not to "disrespect[]" Jefferson. *Id.* Jefferson saw Freddie nod to "[t]he guy that was standing closest to" Savage, and "that guy" hit Savage twice in the face. *Id.* at 86-87. Savage testified that when he, Jefferson, and Jasper came out of Jefferson's ex's apartment, "[a] fight broke

out" with the occupants of the SUV.[22]  *Id.* at 191, 246.  According to Savage, the occupants of the SUV were "underneath the tree" and "in the shadows" and someone was "making open statements" without making clear to whom those statements were directed.  *Id.* at 191-92.  Savage testified that the occupants of the SUV seemed to have taken it personally when he earlier suggested that most people could distinguish synthetic marijuana from higher quality marijuana.  *Id.* at 192, 246.  Savage informed them that he "is Ghost Face from 107" so they should speak clearly if they were directing their statements to him.  *Id.* at 193.  In response, "one of the guys . . . punched [Savage] twice" in the face.  *Id.* at 193.  Savage "smiled," the fight moved to the parking lot, and the fight lasted about ten minutes.  *Id.* at 193-94.

Jefferson and Savage also differently remembered several details of the fight.  Jefferson testified that after Savage was hit in the face, she left the parking lot and knocked on "someone else's door that [she] know[s] out there and they didn't answer."  *Id.* at 87.  Jefferson turned around to return to the parking lot when she saw "Freddie and another guy" moving "between the cars" and toward her.  *Id.* at 87-88.  Freddie tried to hit Jefferson but missed, Jefferson fell "and jumped back up real quick," and Freddie swung at her and

---

[22] A reasonable juror might infer from the record that the occupants of the SUV are the same people Jefferson described as Freddie and his homeboys.

missed again.  *Id.* at 88.  Jefferson tried to call out to Savage and Jasper "but they had, like, knocked out two dudes and they were still each fighting one other guy."  *Id.*  Jefferson, who drove the car to the apartment complex, "realized that [she] had the keys, and [she] took off running and hopped in the car."  *Id.*  As she was trying to tell Savage and Jasper they should leave, Jefferson heard gunshots, so she ducked down in the car.  *Id.*  When Jefferson "looked up" she saw that Freddie had fired a gun in the air.  *Id.* at 88-89.  Jefferson testified that, by that time, Savage and Jasper also were "ducking down in the car."  *Id.* at 89.  When Jefferson got ready to drive away, "[a]nother car hit the passenger door of the Intrepid."  *Id.* at 90-91.  The other car was driven by "some girls also outside with Freddie."  *Id.* at 91, 154.  Jefferson, Savage, and Jasper, all of whom were in the Intrepid when it was hit by the other car, left before any police officers arrived.  *Id.* at 92-93.  As Jefferson drove out of the parking lot, she saw security officers chasing Freddie on the grass, and saw Freddie throw a gun.  *Id.* at 89, 92, 143.  Jefferson, Savage, and Jasper then returned to Savage's house.  *Id.* at 92.  Jefferson estimated they had been at Comanche Park Apartments for about twenty to thirty minutes before they returned to Savage's house.  *Id.* at 95.

Savage testified that spectators gathered in the parking lot to watch the fight, he "dump[ed]" the "guy" who had punched him in the face and

continued hitting him while he was on the ground, and that Jasper was fighting with and knocked out a guy with a walking stick. *Id.* at 193-94. According to Savage "[a] lot of individuals were trying to fight" Jefferson, and he fought alongside her and Jasper until the three agreed that they needed to get in the car. *Id.* Savage testified that Jefferson got in the car while Savage and Jasper were still fighting with "other individuals." *Id.* Then, Freddie "came out with a gun."[23] *Id.* Savage, who still was standing in the parking lot, saw Freddie "point[] the gun into the ground and let off one shot." *Id.* at 195, 289. Savage saw Jefferson put the car in reverse, with the passenger door open, hit a fire hydrant, and "mess[] up the passenger side door." *Id.* at 195, 246-47. Savage then watched as Jefferson "tried to hit [Freddie] with the car" and "ran upon [sic] the curb."[24] *Id.* Savage and Jasper then "jumped in the car and [they] took off." *Id.* Savage first testified that he and Jasper both jumped into the car through the driver's side back door but then remembered that he "jumped into the front because [he] had to hold the front door shut on the ride home the whole way." *Id.* at 196. Savage did not see

---

[23] Consistent with his vague testimony about whether he knew the names of any individuals he encountered at the apartment complex, Savage testified on direct examination that "[a] guy came out with a gun." ECF No. 15-2 at 194. On cross-examination, Savage identified the person with the gun as Freddie. *Id.* at 246-247.

[24] Jefferson expressly denied trying to hit Freddie with the car. ECF No. 15-2, at 154.

any police officers during the altercation.  Id.  He saw security officers before the trio left the complex and returned to Savage's house.  *Id.* at 196-97.

After they returned to Savage's house, Savage's primary concern was that Harris would be mad about the damage to her car.  *Id.* at 197.  Savage testified he was upset with Jefferson about that damage and because she also damaged the bottom of the car when they arrived at Savage's house "because she scraped up against the gate and [Savage's] leg was out and . . . the door kept pressing up against [his] leg."  *Id.* at 198-99, 252.  Savage told Jefferson "that the fight was unnecessary, you know, her trying to hit somebody with the car."  *Id.* at 197.[25]  Savage described the altercation as "impersonal violence," because Freddie was "trying to disperse the crowd" and "wasn't aiming at any of us" when he fired the gun into the ground.  *Id.* at 198.

While Savage was in the living room telling everyone in the house about the fight, he saw Jefferson go into one of the bedrooms, come back out, hop in the car, and leave.  *Id.*  Savage estimated that Jefferson left about "three minutes" after they returned to Savage's house from the apartment complex. *Id.*  Jefferson testified that she left the house, against Jasper's advice,

---

[25] On cross-examination, Savage testified he did not tell Jefferson that it was unnecessary to try to hit Freddie with the car because it "ma[d]e perfectly good sense" for her to do so given that Freddie had a gun.  *Id.* at 246-47.

roughly ten minutes after they returned. *Id.* at 93-95, 144, 148. She wanted to go back to the apartment complex "to see if everyone was all right out there" because the fight occurred "right in front of" Eisha's apartment. *Id.* at 94, 144. Jefferson testified she "got pulled over on 36th and Lewis" because the passenger door of the Intrepid was damaged and would not stay closed, so the "inside light was on." *Id.* at 95, 144.[26] Jefferson further explained the traffic stop:

> Q. What happened when you got pulled over?
>
> A. Well, when I got pulled over, they took my I.D. and ran my name and I had a warrant, so they took me for that. And also when they searched the car, they ended up finding a firearm.
>
> Q. You know what type of firearm it was?
>
> A. I believe it was a .38 revolver.
>
> Q. And did you get a case because of that?
>
> A. Yes, sir.
>
> Q. Now, were you taken to jail?
>
> A. Yes, sir.
>
> Q. Okay. And did you bond out?
>
> A. The next morning, yes, sir.

---

[26] Defense counsel asked, "So you drove back in the apartment complex and you're almost immediately stopped; correct?" ECF No. 15-2 at 144. Jefferson testified "I got pulled over on 36th and Lewis and that was the only place to pull in. That's a long wooded street." *Id.* This question and response suggest that Jefferson was driving when police officers stopped her.

Q. So you bonded out early that next morning?

A. Eisha - - yeah, I bonded out.

Q. And where did you go after you bonded out?

A. After we left David L. Moss, we went to Comanche and they got the Intrepid from out there because they left it out there, you know, through the night to the next morning. And they drove it back to the house. We followed them, you know, because the door was still messed up and stuff.

*Id.* at 96. On cross-examination, Jefferson testified the gun that officers found in the car during the traffic stop was "on the passenger side of the car," and that if a police report said it was found in the center console that would be wrong because the officers found it under the passenger seat. *Id.* at 145-46.[27] Jefferson testified that she went back to the apartment complex by

---

[27] The Court received, through a letter submitted on Smith's behalf by a non-party, what appears to be an authentic copy of a TRACIS report, specifically, a Tulsa Police Department Arrest and Booking Data report, documenting that Jefferson was arrested on October 22, 2010, at 2:30 a.m. and was booked into the Tulsa County Jail at 3:51 a.m. that same morning. ECF No. 20 at 38. The report indicates that police officers looking for Freddie saw Jefferson sitting in the Intrepid, in the parking lot of Comanche Park Apartments, determined Jefferson had "warrants," and found a .32 caliber revolver in "the center console" of the Intrepid. *Id.* This appears to be the report defense counsel referred to when asking Jefferson about her arrest. Per the report, Jefferson told the arresting officers "she knows what happened with Freddie Smith." *Id.* As further discussed, *infra*, this report is supportive of, but not necessary to, the Court's conclusion that Smith's gateway actual innocence claim is credible. When Respondent files a merits brief, as directed by this Opinion and Order, Respondent will have the opportunity to challenge the authenticity of this report or to otherwise argue why the Court should not consider information from this report in adjudicating the Petition.

herself but she did not "even know the gun was in the car." *Id.* at 146, 148.

The prosecutor also elicited the following testimony from Jefferson about any

interaction she had with police officers during and after the altercation with

Freddie:

> Q. And you remember when [defense counsel] was asking you about whether police came out there or not?
>
> A. Right.
>
> Q. Did you ever see the police?
>
> A. During the altercation, no. But after I got pulled over, of course, they were there. People had called them about, you know, what had just happened. Probably security probably called them first.
>
> Q. So if police were nearby or close by - - so if police were nearby or close by Comanche Park when all of this was going on, did you know that or would you know that?
>
> A. No, sir.
>
> Q. And to this day, Ms. Jefferson, have you ever talked to the police about that altercation that happened at Comanche Park with Freddie?
>
> A. No, sir.

*Id.* at 159-60.

Savage testified that after Jefferson drove off in Harris's car, Jefferson

was "gone for quite some time" and no one could reach her by phone. *Id.* at

200. Savage later found out that Jefferson "got arrested at Comanche Park"

for having a gun—Savage's .32 caliber revolver—and "went to jail." *Id.*

Savage ordinarily kept that gun in a shoe box in Eisha R.'s bedroom closet—

the same bedroom Savage saw Jefferson enter and exit before Jefferson left, alone, in the Intrepid and ended up in jail. *Id.* at 200-01, 247. Savage testified that Eisha R. "bonded [Jefferson] out the next day." *Id.* at 200.

Detective Regalado testified he was "aware" that a "shooting took place" on October 22, 2010, but he could not recall whether it occurred at Comanche Park Apartments. ECF No. 15-3 at 15. Defense counsel elicited the following testimony from Regalado regarding his investigation:

> Q. Did you do any investigation into the shooting the day prior to October 22nd at Comanche Park?
>
> A. Did I do any investigation into it? I reviewed it. I didn't have a part in that particular arrest or investigation per se but I was aware of it and the circumstances and the individuals involved.
>
> Q. So you were aware Ms. Jefferson was arrested for possession of a firearm at that scene?
>
> A. Yes.

*Id.* at 40-41.

### b. New evidence

In October 2010, Freddie and Young worked at the Drillers' Stadium in Tulsa. ECF No. 14-4 at 12.[28] Around 10:00 p.m. on Thursday, October 21, 2010,[29] Porter drove to the Drillers' Stadium, picked up Freddie and Young, and drove everyone home to the Comanche Park Apartments. *Id.* at 12, 14. Porter parked in front of one of the apartments. *Id.* While Freddie, Young, and Porter were sitting in Porter's car, Freddie and Porter saw a car being driven recklessly through the parking lot. *Id.* Porter described the car as a "red car" that was "driving crazy." *Id.* at 14. That car parked in the space next to Porter's car, and Porter recognized its occupants as Jefferson, Jasper and Savage. *Id.* Freddie states that Porter confronted Jefferson, asking her why she was driving recklessly. *Id.* at 12. Jefferson opened her car door to respond and hit the passenger door of Porter's car with her door. *Id.* at 12, 14. According to Porter, Jefferson "was extremely aggressive with her

---

[28] Smith's presentence investigation report, included in the state court record, indicates that Smith also worked at the Drillers' Stadium during the 2010 season. ECF No. 15-7 at 178. This information was not presented to the jury, and neither Freddie nor Porter mentions this information in his affidavit.

[29] Neither affidavit identifies October 21, 2010, as a Thursday, but, as discussed, it is clear from the record that the shooting on North Harvard occurred early in the morning on Saturday, October 23, 2010. *See supra* n. 18. October 21, 2010, thus would have been Thursday.

response." *Id.* at 14.  Freddie and Young then got out of Porter's car, and Jasper and Savage got out of the other car.  *Id.* at 12.  Jefferson "got real slick at the mouth," and a fight ensued with Freddie fighting Jefferson, Jasper fighting Young, and Porter fighting Savage.  *Id.* at 12, 14.  Freddie states that Jefferson tried to punch him, and he had Jefferson "down on the ground and got up off her."  *Id.* at 12.  According to Freddie, "[o]ne of [Jefferson's] homeboys who was observing the fight, walked up to [Freddie and Jefferson] with a gun.  The guy with [the] gun and [Freddie] started wrestling over the gun."  *Id.* at 12.  The unidentified guy ran when Freddie gained control of the gun.  *Id.*  Meanwhile, Freddie saw Jefferson get into her car.  *Id.*  Freddie states that Jefferson drove in a circle, tried to hit him with the car, and "grazed" him.  *Id.*  Jefferson tried again to hit Freddie with the car, so he fired two shots at her.  *Id.*  Porter states that he stopped fighting when he heard a gunshot, and everyone started running.  *Id.* at 14.  Freddie saw Jefferson drive away from the apartment complex.  *Id.* at 12.  Shortly thereafter, police officers "pulled up."  *Id.*  Freddie ran, dropped the gun, and eluded the officers who chased him.  *Id.*

On January 25, 2017, roughly four hours before he died, Young told his cousin, Tiffany Tanner, that "he had gotten into a big fight" at Comanche Park Apartments in 2010, that he slipped and fell during the fight, that

Jasper "proceeded to kick him in the face several times," that he heard gunshots, and that everyone took off running, that he could not let the fight go, and that Jasper later called him making threats. *Id.* at 16-17. Freddie states that Jasper not only kicked Young in the face several times during the fight but also threatened to fight Young "every time they saw each other." *Id.* at 13.

### 2. Shooting on North Harvard

Regarding the shooting on North Harvard, the State presented testimony from two eyewitnesses, Jefferson and Savage; three law enforcement officers, Officer Vernon McNeal, Detective Richard Aschoff, and Detective Regalado; a medical examiner, Dr. Joshua Lanter; and Jasper's mother, Phyllis. Smith presented testimony from one law enforcement officer, Sergeant Bayles, and all four of Smith's affiants—Freddie, Porter, Tanner, and Tomique Thomas—provide statements about their knowledge of the shooting.

### a. Old evidence

### i. Eyewitnesses

Jefferson testified that she returned to Savage's house in the "daytime" after bonding out of jail and retrieving Harris's Intrepid from Comanche Park

Apartments.[30]  ECF No. 15-2 at 97-98.  Jasper wanted Jefferson to go to a video shoot, but she "was tired and stuff from the night before," so she told him to call when he was finished.  *Id.*  Jefferson stayed home and rested.  *Id.* at 98.  Eisha R., Savage, Harris and at least two children were home during the day, and Jasper returned "later that evening."  *Id.*

Savage testified he was at his house when Jefferson returned home after bonding out of jail, and that Eisha R. took Harris to Comanche Park Apartments to bring the Intrepid home "because the car was never impounded."  *Id.* at 201.  According to Savage, the following people were home during the day:  Savage, Harris, Eisha R., Jefferson, Jasper, Gabrielle, LeKyle, Savage's two children, and four of LeKyle's children.  *Id.* at 201, 203. When the prosecutor asked whether anyone made "plans for that day," Savage testified:

> A. No.  We talked.  I talked to - - [Jefferson], she thought I was going to be upset with her about the pistol getting taken but I wasn't.  I just told her, "You don't need to make any moves like that."  You know, there was no reason to go back to Comanche.

---

[30] It is not clear from Jefferson's testimony who was involved in retrieving the Intrepid from the apartment complex parking lot.  Jefferson testified that Eisha R. bonded her out of jail then states, "After we left [the jail], we went to Comanche and they got the Intrepid from out there because they left it out there, you know, through the night to the next morning.  And they drove it back to the house.  We followed them, you know, because the door was still messed up and stuff."  ECF No. 15-2 at 96.

. . .

Q. What did you all do that day?

A. Um, I was going to school. No. As a matter of fact, when the car - - that morning when [Jasper] and I woke up, we fixed the door. He tied the door down. We put the plastic on the window. I had court that day. And so - - and I - - he came to court with me. Came in. We left. I was going to the University of Phoenix for my bachelor's in criminal justice, and so I had a powerpoint presentation that I had to work on. So I was working on that. That - - after we left the courthouse, we had went to McDonald's. We got something to eat. We went to the liquor store. We got some vodka, came to the house.

Q. So you all were planning on drinking some that night?

A. Yes, sir.

*Id.* Jefferson testified they "got two bottles of liquor," played drinking games, and "kind of chilled for a little bit." *Id.* at 98, 149. Savage estimated they were drinking for "about an hour." *Id.* at 204.

Jefferson and Savage differently remembered Smith's arrival at the house and some of the events that immediately preceded the shooting. Jefferson testified it was hot inside the house after the group played drinking games, so she, Savage, Harris, Eisha R., and Jasper "went outside to get some air." *Id.* at 99, 149-51. Jefferson then went back inside "for a little bit" and "started texting on [her] phone." *Id.* at 99. Jefferson testified that she looked outside when she heard Smith's voice and saw Smith walking up the driveway. *Id.* at 99-100, 150. Smith was dressed in "all black; black hoodie, black jeans, [and]

black and white Jordan's." *Id.* at 113-14. As Smith walked up the driveway, Jefferson saw Smith briefly "flash" a gun that he had in his hoodie. *Id.* at 113-14, 152. Jefferson had known Smith about one year, she knew him from Comanche Park Apartments, and she knew him as "Cross." *Id.* at 99-100, 140, 150.

Jefferson testified she went back outside because she heard Smith talking about the fight with Freddie. *Id.* at 101, 152. Jefferson did not say anything to Smith because Savage and Jasper "spoke up" for her and explained that Freddie had started the fight. *Id.* at 101-02, 152. Jefferson testified that Smith "was trying to say he heard something else, and they were trying to tell him whatever they were telling him." *Id.* at 102. Jefferson got upset and walked away. *Id.* As Jefferson walked to the house from the driveway, Smith "was hollering out stuff to" her and called her "his bitch." *Id.* at 105. Jefferson testified that she responded by accusing Smith of being "mad because [Jefferson] took a bitch from [Smith]." *Id.* After trading these insults with Smith, Jefferson went into the house and sat in her bedroom. *Id.* According to Jefferson, everyone was in the driveway during this verbal encounter. *Id.* at 102-03.

After Jefferson described this encounter with Smith, the prosecutor asked Jefferson if Harris's Dodge Intrepid, as depicted in the crime scene

44

photograph admitted as State's Exhibit 10, also was in the driveway.  *Id.* at 103; *see* ECF No. 15-5 at 9 (State's Ex. 10).  Jefferson testified it was not and explained, "I think from me getting it wrecked, that they were trying to get it fixed so it wasn't at the house."  *Id.*  The prosecutor tried to move on, but Jefferson continued:

> Q. Well, that's fine.
>
> Now did you go in the house?
>
> A. You know what, I honestly - - rethinking, I don't  - - I don't believe that the car was there the night that I got shot but really, I'm not sure.
>
> Q. Okay.  So you're not for sure.  If the car was there, it was there; if it wasn't, it wasn't.
>
> A. No, not that night.
>
> Q. Do you have any specific memory of it being there or not being there?
>
> A. I can't remember if it was right there that night or not.  I know the gray car - - it was a gray Mazda that was there that night.  I know that car was there.

*Id.* at 103-04.  Defense counsel also sought further clarification as to whether any cars were in Savage's driveway.  *Id.* at 167.  Jefferson testified the only car she remembered was Eisha R.'s gray Mazda; "I'm not sure if the Intrepid was there or not, but just one gray - - the gray car."  *Id.*

Savage testified that the group Jefferson identified did not go outside after playing drinking games.  *Id.* at 204.  Rather, Savage and Jasper "eventually"

went outside because Smith came over.  *Id.* at 204, 206.  Savage testified that he had never seen Smith before, that Smith came over because Jasper "called him over there," and that Smith came over about ten or fifteen minutes after Jasper got off the phone.  *Id.* at 204-06, 253.[31]  Savage estimated that Smith arrived between 12:45 a.m. and 1:20 a.m., on Saturday, October 23, 2010.  *Id.* at 283.  Smith introduced himself to Savage as "Cross," Jasper and Smith hugged, and Smith described Jasper as his "day one."[32]  *Id.* at 208.  Savage described Smith as wearing a black hoodie, black jeans, and tennis shoes.  *Id.* at 212.  Savage did not see Smith with a weapon at that time.  *Id.*  Savage testified that while he, Smith, and Jasper were outside talking in the driveway, and while Jefferson was in the house, Smith described Jefferson as a snitch and asked Jasper why he was associating with Jefferson.  *Id.* at 208-

---

[31] When asked how he knew Smith was outside, Savage testified:

> I was in the  - - in our bedroom.  I was doing my homework.  And [Jasper], he came in.  He's, like, "He's here."  And I said, "Who's he?"  And he said, "Cross."  And I said, "Okay."  Like I said, I had never met this individual before so it was no reason for me not - - since I was the man of the house, there was no reason for him to come in and I not be there.  So [Jasper] went outside.  I went outside.  We met at the porch.

*Id.* at 207.

[32] Savage explained that "day one," means "somebody that you been knowing for many years, probably that you grew up with.  And so since day one, since birth, you been good friends."  *Id.*

10.  According to Savage, Jasper responded that Jefferson's status as an informant could not be verified because they had no "paperwork" identifying her as an informant.[33]  *Id.*  This conversation lasted "[a] good 35 minutes." *Id.* at 253.  Savage testified that Jefferson came outside "[a]fter the initial 15 to 20" minutes of this conversation.  *Id.*  According to Savage, when Jefferson came outside, she shook hands with Smith, and said, "What's up?"  *Id.* at 210.[34]  Savage testified that Smith told Jefferson she "knew" why Smith was there; Smith accused Jefferson of being "high"; and Jefferson denied "telling on Two Piece and Big Mark" or being on their "paperwork" and said she was "cool with both of those guys."  *Id.* at 210-11.[35]  Savage testified that Smith responded by telling Jefferson that he did not "have to show [Jefferson]

_____

[33] Savage's testimony about Smith and Jasper's conversation about Jefferson was a relatively long narrative response, with detailed dialogue, to the prosecutor's question about the meaning of the phrase "day one."  ECF No. 15-2 at 208.  At the prosecutor's request, Savage also explained that "[i]f you're on the streets" and found to be an informant or a snitch people will "likely . . . try to kill you."  *Id.* at 209.  He further explained that paperwork "would be documents from the court or from your lawyer, talking about your case to where it's in printed form, that you have actually informed on somebody."  *Id.* at 209-10.  Savage testified he was not aware of Jefferson being on anyone's paperwork.  *Id.* at 210.

[34] Savage's testimony included a detailed dialogue of the conversation between Smith and Jefferson.  ECF No. 15-2 at 210-11.  Defense counsel objected on hearsay grounds as to Jefferson's portion of the conversation, but the objection was overruled.  *Id.* at 211.

[35] Two Piece and Big Mark are not further identified in the trial record, and it is not apparent from the record why Smith would be concerned about whether Jefferson was "telling on" them.

paperwork" because "[t]he hood knows [she is] hot." *Id.* at 208, 211.  Savage

testified that when a person is "hot" that means that person is an informant.

*Id.* at 208.  According to Savage, Jefferson responded to this accusation by

stating to Smith, "The reason you're mad at me is not because I'm an

informant but because I took a female from you and I gave her back."[36]  *Id.*

at 211-12.[37]  Savage testified that Jefferson specifically used the word

"female" and identified that female as "Sabrina." *Id.* at 212.  According to

Savage, Smith's demeanor then changed:

> Cross, he had - - ever since he had been there, he hadn't been
> argumentative, confrontational, or anything like that.   When
> [Jefferson] said that, his demeanor changed.  He called her a bitch.
> He was like, "No, bitch, you didn't take a bitch from me.  You my
> bitch, as a matter of fact."  So [Jefferson] looked at me, she looked
> at [Jasper] and so she was, like, "Bro, that's what I'm talking
> about."  So she went to the house.

*Id.*

After Jefferson went inside, Smith "quit hollering at her." *Id.* at 213.

Savage testified there was an SUV parked on Tecumseh, near the Dollar

---

[36] Jefferson testified that she did not remember Smith calling her a
"snitch," at any point preceding the shooting, even after the prosecutor asked
a leading question about whether Smith called Jefferson a "snitch," the trial
court sustained defense counsel's objection to that question, and the
prosecutor rephrased the question seeking the same answer.  ECF No. 15-2
at 117.

[37] Defense counsel objected to Savage's testimony about what Jefferson
said to Smith on hearsay grounds, and the trial court overruled the objection.
ECF No. 15-2 at 211.

General parking lot.  *Id.* at 213, 254.  Savage had seen the SUV when he first went outside and had noticed it was running because he could see its brake lights on, as if "somebody was on the brake."[38]  *Id.*  Savage testified

> An individual got out of that SUV and came up to Harvard.  They walked up to Harvard.  They didn't cross the street to our house, they stayed across the street.  And the guy was like, "Hey, bro, come on, man, just come on.  Let's go."

*Id.* at 213.  When asked if he had seen that individual before, Savage testified, "No. Oh, yes. Yes, I had."  *Id.* at 214.  He then identified that individual as Freddie, "the one that had pulled the gun out and shot into the ground" at Comanche Park Apartments.  *Id.*  According to Savage, Smith declined to leave, stating, "I got it, I got it," and Freddie "went back [and] got into the car."  *Id.*

Savage testified that Smith then offered to "squash the whole thing" with Jefferson, so Savage went inside to talk to Jefferson while Jasper remained outside with Smith.  *Id.* at 214-15.  Jefferson testified that both Jasper and

---

[38] The trial judge asked Jefferson if she saw any vehicles on the street in front of the house on the street before the shooting.  ECF No. 15-2 at 163.  Jefferson testified that when she saw Smith "walking across the street, there was a car parked on - - on the street, on the side of the Dollar General" across from Savage's house.  *Id.*  Jefferson could see the back of the car and it appeared to her that the car was running because she could see "red" lights.  *Id.* at 164-65.  In response to follow up questions from defense counsel, Jefferson testified that she saw a car, not a truck or an SUV, parked near the Dollar General.  *Id.* at 167.

Savage came inside and encouraged her to shake hands with Smith so she and Smith could "squash . . . the whole mess." *Id.* at 105, 112-13, 152-53. It is unclear from Savage's testimony whether "the whole thing" that needed resolved was Jefferson's alleged status as an informant or her alleged dispute with Smith over Schrader, but Jefferson testified the "mess" she referred was the latter dispute. *Id.* at 105-13. Jefferson testified that Schrader and Smith had an "open relationship"; that Schrader broke up with Smith to date Jefferson for roughly three weeks after Jefferson reluctantly agreed to be in a relationship with Schrader because Jefferson needed a place to stay and Schrader had an apartment; that Jefferson broke up with Schrader about four months before October 22, 2010; and that Jefferson thought, at the time of the shooting, that there was no longer any "bad blood" between her and Smith. *Id.* at 105-112, 150.

Regardless of whether Savage alone, or Savage and Jasper together, went inside to encourage Jefferson to resolve things with Smith, Jefferson testified she was reluctant to go outside because "it was out of [her] character to try and squash" a matter that she thought already had been resolved. *Id.* at 114, 152-53. Jefferson testified it took "[j]ust a couple of minutes" for Savage and Jasper to persuade her to go back outside. *Id.* at 114-15.

Savage testified that when he and Jefferson went outside, Jasper and Smith, who had previously been standing near the end of the driveway, "had moved closer to the porch" and were standing near the bottom of the front steps. *Id.* at 215. According to Jefferson, Smith was standing in the grass near the porch, close enough for the two to shake hands; Savage, Jasper, Harris, and Eisha R. also were outside. *Id.* at 115-17.[39] Jefferson and Savage both testified that Jefferson offered to shake hands with Smith, but he "started cussing at" Jefferson. *Id.* at 115, 216. According to Savage, Smith "started calling her bitches again," and Jefferson "started walking back up the steps to go into the house." *Id.* at 216. Jefferson testified that she was standing "on the front porch," that she told Savage and Jasper she should have stayed inside because she knew Smith did not want to shake hands, and she "turned around" to walk back in the house. *Id.* at 117-18.

The shooting began after Jefferson's second verbal altercation with Smith. Savage and Jefferson provided different perspectives on how the shooting unfolded. Jefferson testified she "turned around and took two steps into the house and ended up . . . shot three times." *Id.* at 117-18. Savage testified that

---

[39] The trial transcript reflects that Jefferson was using a crime scene photograph, State's Exhibit 9, to show the jury where everyone was standing, but only her testimony about Smith's location is clear on that point.

> [w]hen [Jefferson] started to walk into the house, Cross looked to the left and then he looked to the right, and he reached for his waistband. And when he did that, [Savage] grabbed [Harris and] threw her down on the side of the Intrepid because [Savage knew] what was about to happen. So [Smith] pulled out a gun and he started shooting.

*Id.* at 216. Savage kept Harris on the ground as he watched the shooting through one or more windows on the Intrepid. *Id.* at 217, 255-57.[40]

Jefferson testified she was in the doorway with her back to Smith, that she got "shot three times," and that she heard "[a]bout seven" shots. *Id.* at 118-19. She felt one bullet hit her but did not feel the other two. *Id.* at 120-21. Savage testified that, as he hid behind the car with Harris, he saw "a chrome nickel-plated semiautomatic" nine-millimeter pistol and saw Smith shooting in Jefferson's direction after "[s]he had already walked into the house." *Id.* at 217, 256. Savage estimated that Smith fired "eight to nine" shots while he was aiming the gun toward the house. *Id.* at 256. Savage saw Jasper standing right next to Smith and heard Jasper ask Smith what he was doing. *Id.* at 217. Smith then "stopped shooting into the residence and

---

[40] Savage testified, "I was kind of, like, at an angle, so I could look through the front door - - through the windshield, through the driver's side window, passenger - - through the driver's side door window and I could look straight through the windshield and I could watch the whole scenario." ECF No. 15-2 at 217. On cross-examination, Savage initially testified the Intrepid was the only car outside at the time of the shooting. *Id.* at 256-57. Savage later recalled that Eisha R.'s Mazda also was outside. *Id.* at 258.

he turned the gun on [Jasper]," so Jasper "took off running." *Id.* Savage testified that Smith fired between three and five shots in Jasper's direction before the "gun clicked on empty." *Id.* at 218, 256.[41]  Savage then grabbed Harris, they ran into the house, and Savage saw Smith "running toward the car" that was parked near the Dollar General. *Id.* at 218, 254-55.

Savage testified that after he and Harris ran inside, he grabbed his .357 magnum, Colt Python from inside the house, went back outside, and fired two shots at the car that had been parked by the Dollar General—the car he saw Smith running to—as that car was leaving.[42]  *Id.* at 219-20, 257.  Savage then went back into the house, grabbed the rest of his guns, put those guns and his Colt Python in Eisha R.'s gray Mazda, and told Eisha R. to leave. *Id.* at 220, 257-58.  Savage testified he sent Eisha R. away with his guns because

---

[41] On cross-examination, Savage estimated that Smith fired at least sixteen shots. *Id.* at 257.  In response to defense counsel's question about where the cartridge cases went, Savage testified, "[o]n the ground." *Id.*  He also testified that no one picked up any cartridge cases from the ground after the shooting. *Id.* at 258-59.

[42] Savage's direct examination testimony about the sequence of events that occurred after he and Harris ran inside the house is temporally disjointed.  Defense counsel attempted to clarify the sequence on cross-examination.  The Court has attempted to chronologically arrange the actions Savage testified he took after he ran inside with Harris based on the Court's reading of his testimony on direct and cross-examination.

he "is a felon so those guns didn't need to be there when the police showed up." *Id.* at 222-23.  Next, Savage "went to see who all was hit." *Id.* at 218.

Inside the house, Savage saw Jefferson in Eisha R.'s bedroom with a bullet hole in her arm; she was sitting on the bed "real calm." *Id.* at 219.  Jefferson testified that after she was shot, she saw that her arm was bleeding, so she walked to her bedroom and sat down. *Id.* at 121.  Jefferson testified she had two gunshot wounds in her left arm and one under her left arm, near her rib area. *Id.* at 120.[43]  According to Jefferson, Eisha R. walked to the bedroom and started screaming because she did not know that Jefferson had been shot. *Id.* at 121.  Jefferson testified that Gabrielle, LaKyle, and five children were in the house, sleeping, when the shooting occurred and that Gabrielle and LaKyle woke up. *Id.* at 124-26.  Jefferson asked Gabrielle for a "hot, wet towel and some water." *Id.* at 126.  According to Jefferson, Savage came to the back room, gave Jefferson a hug, cried, apologized to her for urging her to go outside and shake hands with Smith, and told her someone had called 911.

---

[43] Later, Jefferson again identified her injuries, as depicted in State's Exhibits 42, 45, 46 and 47, but she testified that she did not remember that anyone took photographs of her when she was in the emergency room. *Id.* at 129-32.  Contrary to Respondent's version of the facts, those photographs depict that Jefferson was not shot in the back three times.  ECF No. 14 at 17, 43.  Rather, as previously stated, one bullet penetrated Jefferson's upper left arm and exited into her side chest area; she also had a through and through gunshot wound on her left forearm. *Id.*; *see also* ECF No. 15-5 at 41-44 (State's Exs. 42, 45, 46, 47).

*Id.* Savage also told Jefferson that Jasper had been shot, and that he was going back outside to check on Jasper. *Id.*

Outside, Savage saw Jasper "laying down in the street on Harvard and so [Savage] ran out there to [Jasper]," and "sat down on the ground." *Id.* at 219. According to Savage, Jasper was "calm." *Id.* Savage then testified about a detailed dialogue he had with Jasper about those wounds and his efforts to distract Jasper by talking about Jasper's rap album. *Id.* at 220-21. According to Savage, Jasper could not straighten his leg, so LeKyle "r[a]n outside and straightened [Jasper's] leg out" before going back inside to call an ambulance. *Id.* at 221. The paramedics arrived about ten to fifteen minutes later. *Id.* at 222. Savage testified that Jefferson "was sitting on the trunk of" Harris's car, and Savage told her she needed to go to the hospital "so she went as well." *Id.* Jefferson testified that as she walked to the ambulance, she saw Jasper on the ground and saw paramedics around him. *Id.* at 127-28. After Jasper and Jefferson left for the hospital, Savage went back into the house. *Id.*

Before anyone in the house talked to any police officers, Savage gathered the adults together to instruct them on what they should say:

Q. What did you tell the police?

A. When the paramedics had left, I went back into the house. I told all the adults that were there, [Harris, Gabrielle, and LeKyle],

> I said, "Look, you gonna tell them in the statement, you gonna tell them that it was an individual in all black, he walked up to us, asked what was going on - - he wanted to ask us a question so we said, 'What's up?' and he just opened fire."  I said, "That's what we're going to write down in our statement."  So everybody said, "Okay."

*Id.* at 223-24.  Savage testified that he concocted this false statement because they "were going to take care of the situation" themselves, he had been raised to not cooperate with the police, and he was violating "the code" by testifying at Smith's trial because that is "considered snitching."  *Id.* at 224-25, 269.  On cross-examination, Savage testified that even though Jasper and Jefferson had already left for the hospital when he informed his family of the false statement, Jasper and Jefferson also would have lied to police about the identity of the shooter because Jasper and Jefferson were, at the time of the shooting, active 107 Hoover Crips and they "live by that same code."  *Id.* at 270-71; *see id.* at 273-74 ("[Jefferson], [Jasper], they acted on their own but they were acting according to the way that had been brought up to act, the way they been trained to act.").  Savage testified his intent was to "try, to the best of [his] ability, to kill Mr. Smith," that he sent three "shooters" to Comanche Park Apartments after the shooting only to learn that Smith did not live there, and that his attempt to serve justice by killing Smith was thwarted because Smith "ended up getting arrested" on November 17, 2010, nine days after Savage first told detectives that Smith was the shooter and

one day after Savage told Detective Regalado that Smith was the shooter. *Id.* at 226, 244-46, 263-65.

Jefferson testified she did not talk to any law enforcement officers at the hospital, or later, about the shooting:

> Q. Okay. Now, at the time that all of this happened, did you talk to the police?
>
> A. No, I didn't really [sic] to talk to the police. I just wanted to know if [Jasper] was okay. Because when I was in the ambulance, there's a radio in there, I guess like the police have, and they were saying something about something being fatal. And I know what that means so I wouldn't talk to anyone. I just kept asking was my friend all right.
>
> Q. Did you ever talk to the police that night?
>
> A. No, sir. I wouldn't talk to the police.
>
> Q. Did they try to talk to you?
>
> A. Yes, sir.
>
> Q. Where did they try to talk to you at?
>
> A. Not the police, it was a detective that came in the hospital that was trying to talk to me.
>
> Q. Did you tell the detective anything about what happened?
>
> A. No, sir.
>
> Q. Did you tell the detective anything?
>
> A. No, sir.

*Id.* at 132-33. Jefferson testified she "was scared to talk" and "didn't want to talk to anybody about it." *Id.* at 140. On cross-examination, Jefferson

maintained that she did not talk to Officer Gossett or Sergeant Bayles, or any

other police officers at the hospital on October 23, 2010, and that if any police

officers said that she talked to them at the hospital they would be lying.  *Id.*

at 140-41.  Jefferson recalled talking to "Detectives Bland and Dupler" during

a traffic stop after the shooting, but she denied telling them anything about

the shooting.[44]  *Id.* at 142.  Jefferson also testified that if the detectives said

that she talked to them about the shooting they would be lying.[45]  *Id.*  On

redirect examination, Jefferson testified she was medicated when she was at

the hospital and that she did not remember that anyone took photographs of

her injuries.  *Id.* at 156.

> Q. So if you did talk to the police – I'm not saying you did or you
> didn't – would you remember it at all?

---

[44] As previously stated, Detective Hickey initially investigated the
shooting.  A portion of Hickey's supplemental report that is included in the
state court record indicates that Hickey spoke with an unidentified
"cooperative individual" on November 3, 2010, and learned from that
individual that Cross's "real name is Channen Smith."  ECF No. 15-7 at 56.
According to Hickey's report, that same day, Detectives Blann and Dupler
interviewed Jefferson during a traffic stop.  *Id.*  Jefferson told the detectives
that "she was told 'Cross' is the shooter, but is reluctant to get involved,"
Jefferson was given Hickey's phone number, and Hickey did not hear from
Jefferson.  *Id.*

[45] Jefferson also testified that she "didn't talk to the police at all until
this got serious, until I had to go to preliminary hearing and right now, in
this trial.  I have not spoken with the police actually at all, still."  ECF No.
15-2 at 151.  Detective Regalado testified that he interviewed Jefferson by
phone in 2010.  ECF No. 15-3 at 26-27.

A. I know I didn't talk to the police and detective.  I just kept - - when I was talking, I was wanting to know if [Jasper] was still alive.

Q. All right.  Now, if somebody asked you whether or not those pictures were taken before you were shown those pictures, would you have known those pictures were taken?

A. No, sir.

*Id.* at 157.

Savage testified that when "the detectives released [Savage] from the house," after the shooting, he went to the hospital.  *Id.* at 226.  There, he saw Phyllis (Jasper's mother), Brown (Jasper's girlfriend), Jasper's sister and her boyfriend, "the preacher, and the preacher's wife."  *Id.*  Savage had never met any of these individuals before, but he had called Phyllis after the shooting to let her know that Jasper had been shot and was on his way to the hospital. *Id.* at 227.  Savage testified that he sat down, and Phyllis "started asking [him] questions."  *Id.*

Q. What kind of questions was she asking?

A. What happened?  Who shot my baby?  Things like that.

Q. Did you want to tell her what happened?

A. No.  And so what I told her, I said, "Ma'am, what I can tell you right now is this:  [Jasper] was talking just fine when he went to - - when he was on his way to the hospital."  I said, "So he should be talking."  We go back to see him.  I said, "When you, him and I are by ourselves, we'll tell you exactly what happened."

Q. Did you go back and see Mr. Jasper?

A. Yes.  Probably about 30 minutes later they said we could go back.  We went back.  We were back there for about 30 seconds and he just crashed.

Q. When you say "crashed," what do you mean?

A. Blue light started going off and then the alarm started going off in his room, and they said that we had to leave.  So I had - -  we all had to leave the room.

Q. And what did you think at that point?

A. I know he was going to die.

Q. Did you talk to his mom after that?

A. I did.

Q. Did you tell her anything else?

A. I told his mother in front of the preacher, the preacher's wife, the sister, and the sister's boyfriend, I told the mother everything that happened.

Q. So you told her the whole truth?

A. Told her everything.

*Id.* at 227-28.  After he told Phyllis "everything," Savage went to the cafeteria, "got some type of dessert," sat down to eat, and fell asleep.  *Id.* at 230.  The "sheriff's department" woke him up and asked him why he was there.  *Id.*  Savage testified that he told them he was there to visit Dominique Jasper, and they told him there was no patient with that name, so they escorted him out of the hospital.  *Id.*

On cross-examination, after defense counsel asked Savage about his attempt to locate Smith after the shooting and Smith's arrest, Savage provided some additional information about his conversation with Phyllis:

> A. Well, here's what happened sir: I talked to [Phyllis] at the hospital that night while [Jasper] - - the night he was shot - - well, that morning when he was in ICU.  I told her the truth like I told the jury.  I told her, "Don't say anything to the police."  That's what I told her.  And so I know how the police got this information, initially, because [Phyllis] went to them.  It was only her and myself that knew this information.  So I know how she got the information.  I didn't go forth volunteering information or anything of that nature.  I was on federal probation at that particular time as well as state probation, and the way the detectives were able to find me was through my probation officers.

> Q. Okay.  But still, the fact of the matter is, you made - - you were the one who gave them his name on November 8th, not - - you didn't quit looking for him on November 17th because he had already been captured.  You gave them his name on November 8th.

> ***

> Q. [By defense counsel] You didn't just suddenly quit trying to find him on November 17th like you told the jury a few minutes ago. You gave the police his name on November 8th, didn't you?

> A. I did give them the name.  They already had the name, sir.

> Q. And that was the second different story you have told on this case.  The first story was you didn't know who it was; the second being that you believed it was him on November 8th?

> A. That's correct.

> Q. Okay.  Why would you suddenly change your story between October 23rd and November 8th?

> A. Because of the mother.  That's the reason why.

*Id.* at 265-67.  Savage further testified that he did not want to make Phyllis look like a liar.  *Id.* at 267-68 ("So when I told that woman the truth, I wasn't about to make that woman look like a liar. . . . But the reason why I went ahead and told them was because I had already told the mother the truth.").

### ii. Investigation

Officer McNeal testified that he responded to a shooting at 1843 North Harvard early on the morning of Saturday, October 23, 2010.  ECF No. 15-2 at 30-32.  When he arrived, he found two shooting victims, Jasper and Jefferson, and spoke with two witnesses, Savage and Harris.  *Id.* at 32. According to McNeal, ten people were at the house at the time of the shooting.  *Id.* at 32-33, 36-38.   McNeal was told that seven people, including Harris, were inside the house at the time of the shooting, and three—Savage and the two victims—were outside.  *Id.*  Savage told McNeal "that he didn't know who the person was that shot up the house."  *Id.* at 34-35.  Savage also told McNeal that he had seen a dark SUV drive by and park on Tecumseh Street before the shooter, an unknown "black male," approached Savage's house and asked if he could ask Savage a question.  *Id.* at 38-40.

Detective Aschoff testified that he photographed the crime scene and described the scene as "well lit by the streetlights."  *Id.* at 43-62, 69.  Aschoff described the images depicted in several of the photographs and the evidence

that was recovered from the crime scene. *Id.* Highly summarized, Jasper's blood and clothing, the latter of which had been removed by paramedics after the shooting, were found in the grass and on the street, just north of Savage's driveway, *id.* at 48-49, 61-62; ECF No. 15-5 at 2-4, 6 (State's Exs. 3, 4, 5, 7, 31-32, 34); a red Dodge Intrepid with damage on the passenger side was parked in the driveway, ECF No. 15-2 at 49-50; ECF No. 15-5 at 3, 5, 9-10 (State's Exs. 4, 6, 10, 11); two cartridge cases were found near the location where Jasper had been laying on the ground—one cartridge case was by the sidewalk and one was by the curb, ECF No. 15-2 at 49, 53-56; ECF No. 15-5 at 7, 28, 29, 45-46 (State's Exs. 7, 8, 29, 30, 31, 57, 58); two bullets struck the exterior frame of the front security door of the house, ECF No. 15-2 at 50; ECF No. 15-5 at 14-15 (State's Exs. 15, 16); and one bullet struck the upper area of an interior wall of the house, ECF No. 15-2 at 51-52; ECF No. 15-5, at 21-22, 39-40 (State's Exs. 22, 23, 40, 41).[46] The location where the bullet struck the interior wall and the lack of a corresponding hole in the door indicated to Aschoff that "[t]he door had to have been open." ECF No. 15-2 at 60. The bullet strikes on the exterior frame of the security door and the

---

[46] Detective Aschoff testified that the metal fragment marked by evidence cone number 10 and depicted in State's Exhibit 20 was not a bullet fragment and most likely was "a nail or a tack." ECF No. 15-2 at 51; *see* ECF No. 15-5 at 19 (State's Ex. 20).

bullet strike to the interior wall indicated to Aschoff that the security door likely was open at one point and closed at one point during the shooting. *Id.* at 66. Aschoff testified that officers found evidence of at least six bullet strikes, including three that struck Jasper, but found only two cartridge cases. *Id.* at 65-66. According to Aschoff, a semiautomatic pistol generally ejects a cartridge case each time the gun is fired. *Id.* at 73-74. Aschoff testified that there could be a discrepancy between the number of cartridge cases and bullet strikes found at a crime scene, for example if the pistol does not properly eject the cartridge case or if a shooting suspect removes cartridge cases from a crime scene. *Id.* at 72-73.

Dr. Joshua Lanter, who performed Jasper's autopsy, described four injuries: a "superficial" entrance wound on the back of the head caused by a projectile that traveled through the scalp but did not penetrate the skull; a graze wound on the right shoulder; an entrance wound on the lower back caused by a projectile that traveled through skin and soft tissue, passed through the third lumbar vertebra, injured the bowel, and stopped in the right abdominal area; and an entrance wound on the backside of the left wrist caused by a projectile that passed out through the left palm. *Id.* at 55, 62- 67. Dr. Lanter testified that the wound to the left wrist could have been

caused by the same projectile that struck the back of Jasper's head. *Id.* at 67-68.

Sergeant Bayles testified that he responded to the shooting at North Harvard with two other detectives, went through the crime scene, and went to the hospital to interview Jefferson and Jasper. ECF No. 15-3 at 191. Bayles saw medical personnel treating Jasper in the trauma room. *Id.* Bayles went to another part of the emergency room and spoke with Jefferson. *Id.* According to Bayles, Jefferson appeared to be in a lot of pain. *Id.* at 191-92, 197. Bayles photographed Jefferson's wounds and recovered her shirt as evidence. *Id.* at 193. Jefferson told Bayles that she did not see the shooter. *Id.* Because another officer at the crime scene had mentioned to Bayles that the shooting could be related to an "altercation the night before in Comanche," Bayles asked Jefferson about the altercation. *Id.* at 205. Jefferson told Bayles that "she knew somebody had been involved or someone she knew had been involved in the [altercation] the previous night, but she didn't know who it was for sure." *Id.* Bayles returned to the trauma room and briefly spoke with Jasper, who appeared to be in a lot of pain and appeared to be "sleepy." *Id.* at 193-95. Jasper told Bayles that he did not know who shot him and Jasper described the shooter as "a black male, approximately six-three, wearing a hoodie." *Id.* at 195. Jasper also told

Bayles that he had been sitting on the porch when the shooter walked up to him. *Id.* at 204-05. Bayles discontinued his interview with Jasper because Jasper appeared to fall asleep or lose consciousness. *Id.* at 195, 204. Bayles collected Jasper's pants as evidence. *Id.*

Detective Regalado testified that the shooting investigation was assigned to him, as a homicide investigation, on November 15, 2010, when Jasper died. ECF No. 15-3 at 6-7. Regalado reviewed reports written by other police officers, including Detective Hickey, and interviewed Savage, on November 16, 2010. *Id.* at 7-8, 24-25. Regalado interviewed Jefferson over the phone. *Id.* at 26-27. Through the course of this investigation, Regalado developed one shooting suspect, Smith, and testified that he "was positive that [Smith] was the" shooter. *Id.* at 26-27, 31; *see also id.* at 41 (testifying he did not consider any other suspects, and that "the facts deemed" that Smith "was the only shooter"); *id.* at 51 ("But based on the investigation as it is, then yes, my opinion is that he is the sole shooter of both Carlameisha Jefferson and Dominique Jasper."). Smith was arrested November 17, 2010, and Regalado interrogated Smith that same day. *Id.* at 9-10, 30-31. Regalado testified that Smith denied knowledge of or involvement in the shooting and denied knowing Jefferson or Jasper. *Id.* at 13. After Regalado presented photographs of the shooting victims, Smith told Regalado he knew Jefferson

as "24" and Jasper as "D-Loc." *Id.* at 13-14, 38. Regaldo testified that "there were several inconsistencies with [Smith's] story." *Id.* at 14. He described those inconsistencies:

> Initially that he wasn't even in Tulsa, then it was he was probably at his father's, then possibly Comanche. And ultimately, I believe he said he was, in fact, in Claremore with an individual by the name of Sabrina who he claimed was a girlfriend at the time. However, when asked for Sabrina's information to corroborate that, he was unable to give me any information other than it was Sabrina and she lived in Claremore. And I do believe he gave me a street but was unable to give me a complete address nor a phone number or anything else that would allow me to contact her to verify his claim. However, he maintained that he had never been around the location of the shooting. And that was it, to my recollection, I believe.

*Id.* at 14-15. Regalado testified it was also suspicious that Smith could not provide his parents' cell phone numbers. *Id.* at 37. Regalado testified that Smith maintained, throughout the interrogation, that he did not shoot Jasper and Jefferson. *Id.* at 35-37, 42. He also testified that Smith's inability to recall where he was on specific dates and times three weeks before the interview was shocking because Smith "just shot two people." *Id.* at 36 ("He just shot two people. I'd remember that."). Smith's videotaped statements were admitted and published to the jury. *Id.* at 19-21.

Regalado also testified, over defense counsel's objection, about his experience with what the prosecutor termed "the 'no snitch culture' on the north side of Tulsa." *Id.* at 15-19. Regalado testified that people who

"snitch," or cooperate with the police, can be "at minimum," ostracized by the community and, "at the most," murdered. *Id*. at 16-18. He also testified that it is not uncommon for gang members to refuse to cooperate with the police or to take matters into their own hands through retaliatory shootings. *Id*. at 18-19.

On cross-examination, Regalado testified that his investigation did not rely solely on victim or witness statements identifying Smith as the shooter because "physical evidence" provided some verification of those statements:

> A. As far as physical evidence, the corroboration would be the recovery of spent shell casings at the scene. Both witnesses maintained that - - and victims, I'm sorry, that they were shot. I believe the forensic examination of both bodies will conclude that. So that was physical corroboration there. And - - I'm sorry. And you were referring only to physical corroboration or physical evidence?
>
> Q. And I mean specifically drawing attention to Mr. Smith as in: Were there any DNA evidence recovered? Were there any fingerprint evidence recovered?
>
> A. No, sir.

*Id*. at 39-40, 51. Regalado testified that he could not explain the discrepancy between the number of shots Smith reportedly fired with a semiautomatic pistol and the number of cartridge cases that were found at the crime scene. *Id*. at 41. On redirect examination, Regalado testified that cartridge cases can be disturbed by "witnesses that are trampling through the scene" or police officers who "may inadvertently kick a shell casing," and that "it can be

difficult to maintain every shell casing." *Id.* at 44. He also testified that, though not "as common," "it wouldn't be unheard of" for a shooting suspect to remove cartridge cases from a crime scene. *Id.* at 46. Regalado testified that, unlike a semiautomatic pistol, a revolver does not eject cartridge cases. *Id.* at 48. He also testified that regardless of whether Savage had multiple guns at his house during the shooting, including the gun that Savage fired "at the suspect vehicle," it would not change Regalado's mind that Smith shot Jasper and Jefferson. *Id.* at 48-51.

After the prosecutor and defense counsel examined Detective Regalado, the trial judge sought clarification about when the shooting occurred:

> Q. [By the court] I have a couple of questions - -
>
> A. Yes, Your Honor.
>
> Q. - - just for clarification, please.
>
>    The shooting that is alleged – that Mr. Jasper was shot and Ms. Jefferson was shot – that occurred at the North Harvard Avenue residence, what day of the week was that?
>
> A. October 23rd. And I don't recall, without looking at a calendar, exactly what day that was, but it was the night of the 23rd.
>
> Q. What time of day?
>
> A. It occurred at 2:40 in the morning, I believe, or around 0200, I believe.
>
> Q. And I - - you do not know if that was a Saturday morning or a Friday morning?

A  It's documented on the original TRACIS.  And other than the date, I can't remember what Friday, Saturday it was.  So no, to answer your question as to the day, no, sir.

THE COURT:  Is there a way that the witness' memory can be refreshed as to what day of the week that was?

[The prosecutor produced a report to refresh Regalado's memory.]

Q. [By the court]  All right.  What day of the week, based upon your memory being refreshed, was the - -

A.  And I'm sorry.  Can I review that again?  I looked at the 10-23 again.

Okay, Judge.  I apologize.  It was Saturday.

Q. So Saturday night or Saturday morning?

A.  Saturday morning at 0200 hours or 2:00 in the morning.

Q. On the 23rd?

A. Yes, Your Honor.

*Id.* at 52-53.[47]

### iii. Other trial testimony implicating Smith

In addition to the eyewitness testimony from Jefferson and Savage

identifying Smith as the shooter, and Detective Regalado's investigative

---

[47] Respondent organizes the facts by discussing the fight that broke out at Comanche Park Apartments on Friday, October 22, 2010, and then discussing the shooting on North Harvard that occurred "*the next evening*." ECF No. 14 at 12, 15.  But it is clear from the trial record that the shooting occurred early in the morning on Saturday, October 23, 2010.

conclusions about Smith's role as the shooter, the prosecutor presented testimony from Savage about Smith's "jailhouse confession" and testimony from Phyllis about Jasper's "excited utterance" identifying Smith as the shooter.

At the time of Smith's trial, Savage was housed in the Tulsa County Jail and had pending felony charges of rape by instrumentation, robbery, and firearm possession. ECF No. 15-2 at 231. Savage testified that he was placed in the same holding cell as Smith by "mistake"—on the first day of Smith's jury trial—and that the two were in the same cell for about ten minutes. *Id.* at 232.[48] The following colloquy occurred between the prosecutor and Savage:

> Q. When you went in and saw him, how did you react?
>
> A. It was fine. I mean it's nothing personal between either one of us.
>
> Q. Okay. You say, "it's nothing personal." What does that mean?
>
> A. The violence that took place, it was based off principal. It wasn't based off the individual. The violence that could have occurred would have been based off principal, not according to the individual. It would be something that they had done. It wasn't anything personal.

---

[48] The parties entered on the record an agreed-upon stipulation stating: "that on January 7th, 2013, at court holding, [Smith] and Brandon Savage were in the same cell from approximately 11:23 a.m. till 11:33 a.m. Mr. Smith and Mr. Savage were placed in the same cell by mistake." *Id.*

When I went into the holding cell, we gave each other a hug. We sat down and talked.

Q. So you actually hugged Mr. Smith on Monday and sat down and spoke with him?

A. Yes, sir.

Q. I want you to tell the jury about that conversation.

A. Um - -

[Defense counsel]: Judge, I'd like to renew my objection that I made earlier.

THE COURT: Objection overruled.

A. We had talked about the case. He was, like - - he said, "Bro, I want to know what you gonna do." And so I said, "Man - -" he said - - I said, "I talked with some of the guys," and I said, "I'm not - - I'm not going to testify against you. I'm going to get up there and I'm going to give a different type of statement." And so he was, like, "All right." He said, "All you got to say is this." So I'm, like, "All right. I know." So he had been talking about getting his life right with God. I been talking about getting my life right with God. We were talking about that. It came time for us to leave. I said, "Man, you know they probably not going to put us back together again," and so that was it. We gave each other another hug, he left and I left.

Q. [By the prosecutor] All right. Did you all ever talk about the incident that happened on October 23rd, 2010?

A. Yes.

[Defense counsel]: Objection, Your Honor, leading.

THE COURT: Overruled.

Q. [By the prosecutor] What did you talk about in regard to the shooting at your house?

A. I told him, I said, "Man, look," I said, "I know it was nothing
personal." I said, "You wasn't shooting at me." I said, "You were
shooting at them."

Q. What did he say?

A. He was, like, "Yeah, man." He said, "You know when we out
there under Satan's influence, we don't think a lot of times." And
I said, "Yeah, man, you right." And that was it.

Q. Mr. Savage, why did you tell him that you weren't going to
testify against him?

A. Because up until that particular time I was having a hard time
trying to do it myself.

Q. And is that because of how people are viewed in the streets
when they testify?

A. Yes, sir. You know, it's a difference between the actual right
thing to do and how we view what the right thing to do. A lot of
times individuals make bad choices and they're not bad individuals
but they make bad choices. We have both had that religious
conversation. And one thing that I'm determined to do is to live
my life the right way. So I can't try to move forward and still keep
holding on to things that I used to do. So I can't try to get right
and still try to live by the code of the streets. And so that's why I
have to make this testimony right here.

*Id.* at 233-36.

As the last witness for the State's case-in-chief, Phyllis testified that

she received a phone call from Savage, around 2:30 a.m. on October 23, 2010,

and that Savage told her Jasper had been shot. ECF No. 15-3 at 81-83.

Phyllis drove to the hospital alone and arrived at the hospital within an hour

of receiving the phone call. *Id.* at 82-83, 89. Brown and Phyllis's daughter

arrived at the hospital after Phyllis. *Id.* Phyllis testified she saw Jasper

73

laying down in the emergency room and saw nurses coming in and out of the room. *Id.* at 84-85. According to Phyllis, Jasper was laying down but he was awake and able to speak. *Id.* at 85-86. When asked to describe Jasper's demeanor, Phyllis testified he "was moving around," he had to use the bathroom, "he was destroyed from the gunshot, from being shot," and he was "very, very emotional." *Id.* at 86. When asked "to describe, not what he said, but what his emotions were," Phyllis testified: "His emotions was he was  - - he kept saying, 'Mom, Cross shot me.'" *Id.* at 86-87. Defense counsel immediately objected to this testimony, and the trial court sustained the objection and admonished the jury to disregard the statement.[49] *Id.* at 87.

The prosecutor then asked Phyllis if it appeared to her that Jasper "was still upset or under the stress of being shot that night," and Phyllis responded, "Yes." *Id.* at 88. Phyllis testified that her observations of Jasper and anything he might have said occurred "about within an hour" of the time she received Savage's call about the shooting. *Id.* at 89. Over defense counsel's objection, the trial court ruled, at a bench conference, that Phyllis could testify about what Jasper said to her under the "excited utterance"

---

[49] Defense counsel also moved for a mistrial based on Phyllis's statement, but the trial court denied that motion. ECF No. 15-3 at 87-88.

exception to the hearsay rule.  *Id.* at 89-90.[50]  Phyllis then testified that she asked Jasper, "Who did it?," and Jasper said, "Cross."  *Id.* at 90.  The prosecutor then asked, "What did he say?"  *Id.*  Phyllis responded, "He said, 'Momma, Cross shot me.  Momma, Cross shot me.  Momma, Cross shot me.'"  *Id.*

On cross-examination, Phyllis testified that Savage called her before she went to the hospital and told her that Jasper had been shot, but Savage did not say who shot Jasper when they spoke on the phone.  *Id.* at 92.  She also testified that Savage talked to her "after he got to the hospital," and that she did not talk to Jefferson at the hospital.  *Id.* at 92, 95-96.

### b. New evidence

Freddie and Porter both state that, on the night of Friday, October 22, 2010, Freddie, Porter, Young, Tanner, and a few other people were sitting outside of Freddie's father's apartment, at Comanche Park Apartments, "drinking alcohol and smoking weed."  ECF No. 14-4 at 12, 14.  Porter and

---

[50] In denying postconviction relief, the state district court described Jasper's statement to Phyllis as a "dying declaration," stating, "While Mr. Jasper was dying from his gunshot wounds, he gave a dying declaration to his mother who testified to it at jury trial."  ECF No. 14-6 at 5.  Phyllis's testimony indicates that Jasper made his statement on October 23, 2010. Jasper died on November 15, 2010.  ECF No. 15-3 at 101.

Freddie state that they saw Young leave the apartment complex around 1:00 a.m., driving Crystal Johnson's car. *Id.* at 12, 14. Freddie states that Johnson was Young's girlfriend. *Id.* at 12. According to Porter, Young was still upset about the fight and Young's "face was bruised very badly because [Jasper] had kicked him in the face several times." *Id.* at 14. According to Freddie, Young was "really upset about the fight the previous night" when he left. *Id.* Freddie and the others stayed outside "drinking and getting high until security officers approached them." *Id.* at 12, 14. Freddie states that everyone ran when police officers arrived. *Id.* at 12. According to Porter, Freddie ran, and police officers chased Freddie. *Id.* at 14. Porter states that he sent his girlfriend to pick Freddie up and take Freddie to her house. *Id.* Freddie states that he "jump[ed] the gate on the DHS side of the apartment" complex and hopped a "second fence" before Porter's girlfriend picked him up and drove him to her house. *Id.*

Freddie and Porter both state that they, along with Porter's girlfriend and Tanner, stayed at Porter's girlfriend's house and were "sitting around talking" when Young arrived at the house between 3:00 a.m. and 3:30 a.m. *Id.* at 12, 14. Freddie states that Young, who was dressed in all black, acted "strange," removed his clothes and put them in a trash bag, took out a gun, and started wiping down the gun. *Id.* at 12. According to Freddie, the group

76

"continued hanging out," and "when [Young] arrived again his mood was very somber." *Id.* At some point, Freddie left and spent the night at his own girlfriend's house. *Id.* Later the next day, Freddie learned from a "family friend" that Jasper and Jefferson had been shot. *Id.* Freddie also heard rumors that Smith was the alleged shooter and Freddie "was the driver." *Id.*

Porter states that Young pulled him to the side after Young arrived at Porter's girlfriend's house. *Id.* at 14. Young told Porter that he "just got at them fools." *Id.* Porter asked Young who he was talking about, and Young responded that he was referring to "D-Lo and that dyke bitch," and that Young further stated "[t]hat motherf***er f***ed up putting his feet on me like he did" and that he "caught them slipping in their yard, sitting around drinking." *Id.* Porter also states that Young told Porter that he shot Jefferson when she tried "to run in the house," that Jasper "tried to run and [Young] hit him in the back and the back of his head," and that when Jasper "was on the ground, [Jasper] put his hands up to block his head" so Young "shot [Jasper] through his hands." *Id.* Three weeks after Young told Porter about the shooting, Porter found out that Smith had been arrested. *Id.*

Tanner and Tomique Thomas, both of whom are Young's cousins, state that before Young died in 2017, he told them, separately, that he was the shooter. ECF No. 14-4 at 9-11, 16-17. Tanner states that Young told her,

just hours before he died, that he had shot two people in 2010 and that one had died. *Id.* at 16-17. Young told Tanner that after Jasper called him making threats, Young drove Johnson's car to Jasper's location at some residence. *Id.* at 16. According to Tanner, Young stated that he parked the car, walked to the residence, and saw three people in the yard drinking. *Id.* They were the same three people he and his friends had fought the day before. *Id.* Young told Tanner that he just pulled out his gun and started shooting at Jasper. *Id.* Young told Tanner that he shot "the girl" when she tried to run inside, that the one named Savage ran and hid underneath the car in the driveway, and that he shot Jasper in the back of his hand and the back of his head while Jasper was laying on the ground.[51] *Id.* Thomas states that she took Young grocery shopping one week before he died from cancer, and that Young told her he regretted a crime he had committed. *Id.* at 9. Young then told Thomas that he shot Jasper and that he drove his girlfriend's car when he shot Jasper. *Id.* at 9-10. Thomas also states that Young showed her where he hid the murder weapon. *Id.* at 10.

---

[51] Tanner states that Young became emotional telling her this story, told her that he had never been that angry before, and told her that he had lost complete control. ECF No. 14-4 at 16-17.

### 3. Weekend in Claremore

As previously stated, Smith's videotaped interview was published to the jury. ECF No. 15-3 at 19-22. During the interview, Detective Regalado told Smith he was under arrest for first-degree murder, told Smith that several witnesses had already identified him as the shooter, and told Smith that he was free to go if he could prove to Regalado that he was not in Tulsa on Saturday, October 23, 2010. ECF No. 16, State's Ex. 1 (Parts 1 and 2). Smith maintained throughout the interview that he did not shoot anyone. *Id.* He told Regalado that Schrader picked him up from his parents' house and that Schrader lives in Claremore with her brother and sister-in-law, on Crestview. *Id.* (Part 2). Regarding the weekend of the shooting, Smith stated that he went to Claremore on Friday night and returned to Tulsa on Saturday between 10 a.m. and noon. *Id.* Smith did not recall where he was or what he did on Saturday night, but he thought he was with his parents. *Id.*

Schrader testified that she was dating Smith in October 2010 and that they would spend "every weekend" watching movies at her brother's house in Claremore. ECF No. 15-3 at 106-07. Generally, Schrader and Smith would leave Tulsa on Friday night, no later than 11:00 p.m., and would stay in Claremore until Sunday. *Id.* at 107-08. Schrader testified that, on the weekend of the shooting, Schrader picked Smith up from his mother's house

on Friday night, about 10:30 p.m., they went to her brother's house in Claremore, they went to a Walmart or a gas station the next morning, they watched movies all weekend, they left Claremore around 11:00 a.m. on Sunday to return to Tulsa, and she dropped him off at a car wash, around noon, because Smith "ended up seeing somebody that he knew." *Id.* at 108-09. Schrader maintained, on direct and cross-examination, that she picked up Smith on Friday and he stayed with her until Sunday on the weekend of the shooting, but she admitted that she had trouble recalling "specific dates" and that she had previously provided a written statement indicating she picked Smith up on October 25, 2010. *Id.* at 111-14, 124-26, 135-36. Schrader testified that if October 25, 2010, was a Monday, it would not have made sense for her to have picked Smith up on that day to spend the weekend in Claremore. *Id.* at 135. According to Schrader, the only weekend in October 2010 that Smith was not with her in Claremore was the weekend of Halloween because she spent that weekend with her children and brother "somewhere else." *Id.* at 113, 127, 135-36. Schrader also testified that Jefferson "came over a lot" and "tried to move in" to Schrader's apartment but did not live in the apartment, and that Jefferson "wanted to" date Schrader but the two never dated. *Id.* at 134, 139. On cross-examination, Schrader

testified she had lied to police before, and she had prior convictions for

writing bogus checks. [52]  *Id.* at 131.

Philip Schrader ("Philip"), Schrader's brother, testified he recalled the

weekend of the shooting, because that was the weekend he and his wife

began having marital problems that led to their divorce.  *Id.* at 151-52, 163,

171.  He recalled that Smith, Schrader, and his wife were at his house in

Claremore, on Crestview Drive, that weekend.  *Id.* at 152.  Philip testified

that Smith and Schrader arrived on Friday evening, when it was still light

outside.  *Id.* 152-53.  He testified they sat around and watched TV, and that

he went to bed around 10:00 p.m.  *Id.* at 153.  According to Philip, no one left

the house between Friday night and Saturday morning because the keys for

Philip's and his wife's car—the only two vehicles anyone could have left in—

were in their bedroom.  *Id.* at 153, 156-57.  Philip testified he got up at 1:00

a.m. on Saturday morning to smoke a cigarette and get a drink and he saw

---

[52] On cross-examination, the prosecutor further challenged Schrader's credibility, and further tried to tie Smith to the shooting, by asking her several questions about her boyfriend at the time of trial, Derrick Smith, eliciting testimony that Derrick was abusive to the point of putting Schrader in the hospital, and that Schrader had refused to testify against Derrick. ECF No. 15-3 at 115-17, 130-31, 141.  The prosecutor also asked Schrader if Derrick was Smith's cousin, but she testified that the two are not related.  *Id.* Defense counsel objected more than once to these questions on relevancy grounds, and the trial court sustained the objections.  *Id.*  During a bench conference, the prosecutor informed the trial court he had been told by someone at the prosecution table that Derrick is Smith's cousin.  *Id.* at 142.

Smith and Schrader watching TV. *Id.* at 158, 163, 176. Philip's wife had to work at 8:00 a.m. on Saturday, and Philip hung out with Smith later that day. *Id.* at 154. According to Philip, Smith and Schrader left Claremore on Sunday. *Id.* at 156, 177. Philip initially testified that Smith and Schrader were in Claremore on the weekend of the shooting and on the following weekend. *Id.* at 156. He then recalled that they were not there the following weekend because that was Halloween weekend. *Id.* Philip testified he had prior felony convictions and was incarcerated at the time of trial, but that his criminal history did not affect his ability to remember what happened on the weekend of October 23, 2010. *Id.* at 159, 167-68. On cross-examination, Philip testified he was in prison for kidnapping, shooting with intent to kill, first-degree burglary, and feloniously pointing a firearm, and that his convictions involved shooting at police officers. *Id.* at 168-69.

Canando Smith ("Canando"), Smith's stepfather, testified he has known Smith since Smith was six years old and knows most of his family. ECF No. 15-3 at 225-26. Canando testified that Smith is not related to Freddie and that Smith and Freddie are just friends who "grew up together out there in the apartments" and share "the same last name." *Id.* at 228, 232-33. He also testified that Smith is not related to Derrick Smith. *Id.* at 229. Canando recalled that Schrader picked Smith up from Canando's house on Friday

night on the weekend of the shooting.  *Id.* at 226, 231.  He testified that Schrader picking Smith up on Friday was an "every weekend thing."  *Id.*  He specifically recalled the weekend of the shooting "[b]ecause once [Smith] came back to [his] house, that's when we were hearing all of these rumors about what was supposed to have happened around the corner from my house."  *Id.* at 227.[53]  Canando testified that Smith came back on Sunday, that Schrader dropped him off at a car wash, and that Smith called Canando to get a ride home from Comanche Park Apartments.  *Id.* at 228.  On cross-examination, Canando testified that Schrader picked Smith up Friday on the weekend of the shooting and Friday on the following weekend and that, both weekends, Smith returned home on Sunday.  *Id.* at 237-38.

The State also presented one rebuttal witness.  Heather Prater, a victim-witness advocate with the Tulsa County District Attorney's Office, testified that she was present during two interviews that the prosecutor had with Schrader twice.  ECF No. 15-4 at 11-14.  Prater testified that, during both interviews, Schrader said she could not specifically recall whether Smith was with her on the weekend of the shooting.  *Id.* at 13-15.  Prater further testified that Schrader also stated that she had discussed the issue with

---

[53] Smith stated during his videotaped interview that Canando lives on Woodrow near the Dollar General on North Harvard.  ECF No. 16, State's Exhibit 1.

Philip and that he also could not specifically remember if Smith had been in Claremore that weekend.  *Id.* at 15-16.  Prater testified that she was present in the courtroom when Schrader testified, and that Schrader's trial testimony was different than her interview statements.  *Id.* at 16-17.  On cross-examination, Prater testified that Schrader never said, at trial or during the interviews, that Smith was not with her on the weekend of the shooting.  *Id.* at 18.

### B. Predicted impact on reasonable jurors

The *Schlup* standard for a gateway actual innocence claim is "demanding," but it "does not demand conclusive proof of exoneration."  *Fontenot*, 4 F.4th at 1031, 1035.  Instead, "a petitioner's burden at the gateway stage is to demonstrate 'that more likely than not any reasonable juror would have reasonable doubt.'"  *Id.* at 1030 (quoting *House*, 547 U.S. at 538).

For the following reasons, the Court finds that the timing of the submission of new evidence lessens the reliability of that evidence to some degree but does not make it wholly unreliable, untrustworthy, or incredible. The Court further finds it more likely than not that any reasonable juror would have reasonable doubt about Smith's guilt if confronted with the newly supplemented record.

### 1. Smith's delay in presenting his claim is not dispositive.

Respondent contends, at the outset, that the "sheer delay" in Smith's presentation of his gateway actual innocence claim "cannot go unnoticed." ECF No. 14 at 39.  More specifically, Respondent faults Smith for an "inexplicable" "two-year gap" between Young's death, in January 2017, and Thomas's decision to share information with Smith's family about Young's confession, in June 2019.  *Id.* at 39-40.  Respondent also argues that all four affiants had knowledge of the information in their affidavits before Young's death in 2017 and that none provides a credible reason for waiting "for more than two years after Young's death" to come forward or for "sitting on this information until [Smith's] investigators came by for an affidavit."  *Id.*

Respondent is correct that "[a]n unexplained delay in presenting new evidence may bear on a determination of whether a petitioner has made the requisite showing to overcome the statute of limitations."  *Fontenot v. Allbaugh*, 402 F. Supp. 3d 1110, 1127 (E.D. Okla. 2019), *aff'd sub nom. Fontenot v. Crow*, 4 F.4th 982 (10th Cir. 2021).  And Smith's affidavits, presented more than a decade after his trial and implicating the now-deceased Young as the alleged shooter, exemplify the type of new evidence the Supreme Court has cautioned federal court to view with skepticism.  *See Herrera*, 506 U.S. at 417-18 (noting that "[t]he affidavits filed in this habeas

85

proceeding were given over eight years after petitioner's trial" and that "[n]o satisfactory explanation has been given as to why the affiants waited until the 11th hour-and, indeed, until after the alleged perpetrator of the murders himself was dead-to make their statements").  Nevertheless, "no threshold diligence requirement applies to actual-innocence claims; the delay is simply a factor in the court's reliability evaluation." *Floyd v. Vannoy*, 894 F.3d 143, 156 (5th Cir. 2018); *see Schlup*, 513 U.S. at 332 ("[T]he court may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence.").

For three reasons, the Court finds that the delay in this case does lessen the reliability of the affidavits to some degree, but it does not render that information wholly unreliable, untrustworthy, or incredible.  First, Smith cannot be faulted for the "inexplicable two-year gap" that Respondent homes in on—namely, the two-year gap between Young's death and Thomas's decision to contact Smith's family.  ECF No. 14 at 40.  Two affiants, Thomas and Tanner, state that Young confessed his role as the shooter to them, separately, in the week immediately preceding his death on January 25, 2017.  ECF No. 14-4 at 9-11, 16-17.  Neither affiant, however, shared that information with Smith until June 3, 2019, when Thomas contacted Smith's sister.  *Id*. at 10; ECF No. 1 at 66.  Smith and his family had no control over

whether or when any of the affiants chose to come forward. And nothing in the record suggests either that Smith had personal knowledge of Young's death or that Smith, even if he was aware that Young died, knew or should have known that Young 's death might have some relevance to his case. Further, when Thomas reached out in 2019, Smith's family acted with reasonable diligence by hiring an investigator to interview Thomas, find and interview additional witnesses (including some who testified at trial), and look for other potential evidence before seeking postconviction relief. ECF No. 1 at 66-67. The investigator obtained Thomas's affidavit in October 2019, experienced delay in interviewing other witnesses due to the Covid-19 pandemic, and obtained affidavits from Freddie, Porter, and Tanner in August 2021. *Id.*; ECF No. 14-4 at 9-17. The investigator and an attorney hired by Smith's family went with Thomas to the location where Young told Thomas he hid the gun used in the shooting, but the area had been excavated and they could not locate the gun. ECF No. 1 at 67. After his family retained an experienced criminal defense attorney, Smith filed his application for postconviction relief in October 2022. *Id.* On these facts, the Court finds the two-year gap that concerns Respondent is not inexplicable, it is sufficiently explained.

Second, three affiants—Thomas, Porter, and Tanner—provide reasonable explanations for their own delay in coming forward.  Thomas states she was afraid to come forward with Young's confession, was concerned she might get in trouble, did not know who to talk to, and did not think that the police would believe that Young had asked her to come forward with this information.  ECF No. 14-4 at 10.  Porter states he knew in 2010 that Young had confessed his role in the shooting but Porter "did not want to snitch on [his] best friend" Young.  *Id.* at 15.  Tanner states that even though Young asked her to "make it right" because Smith was in prison for Young's crimes, Tanner was "hesitant to come forward" and "didn't want to be involved" but decided to come forward after discussing it with her family.  *Id.* at 17.  Given evidence in the trial record, advanced by the State to bolster the credibility of its own witnesses, regarding the "culture" in some Tulsa communities to avoid being ostracized or killed for "snitching" or for otherwise seeking help from the police, the Court finds these three affiants sufficiently explain their delay in coming forward.  Freddie's explanation for his delay, however, is less plausible.  Freddie states that in 2010, shortly after he learned that Jefferson and Jasper had been shot, he began hearing rumors that Smith was the alleged shooter and that he allegedly drove Smith away from the shooting.  ECF No. 14-4 at 12.  He further states that he knew he "had absolutely nothing to do with the shooting . . . but was afraid to come forward with this

88

information due to the fact the police were trying to charge [him] with this crime." *Id.* Other than Savage's trial testimony identifying Freddie as the driver of the getaway car/SUV, nothing in the record indicates that the State attempted to prosecute Freddie for the shooting on North Harvard either before, during, or after Smith's trial.[54] Like Respondent, the Court questions Freddie's explanation for not sharing the information he provides in his affidavit until 2021. But Freddie's delay does not render his affidavit entirely untrustworthy. To the extent the reliability of the new evidence is lessened by any affiant's delay in coming forward, the impact of that delay is largely mitigated by the extent that the new evidence corroborates and supplements the old evidence.

## 2. Smith's claim is credible.

Respondent contends Smith's gateway actual innocence claim is not credible because (1) the new evidence "neither supplements nor corroborates

---

[54] The Court does, however, take judicial notice of publicly available state court records showing that Freddie was convicted in 2012 (before Smith's trial), upon his guilty plea, of being a felon in possession of a firearm for holding a firearm and running from the police on October 22, 2010—the same date as the altercation at Comanche Park Apartments. *See* Plea of Guilty – Summary of Facts (#1018723845), *State v. Smith*, Tulsa County District Court Case No. CF-2010-4547, available through Oklahoma State Courts Network, https://www.oscn.net (query: Case No. CF-2010-4547).

the preexisting evidence" and (2) "the State's case against [Smith] was overwhelming."  ECF No. 14 at 40-44.  The Court disagrees on both points.

### a. New evidence supplements and corroborates the old.

As Respondent acknowledges, even "late-arriving affidavits" can provide "trustworthy eyewitness accounts" if they are "supplemented with a significant amount of contemporaneous documentary evidence" or they "draw their strength primarily from how they interlock with statements made at or prior to" trial.  *Fontenot*, 4 F.4th at 1056.  The Court finds that all four affidavits provide trustworthy eyewitness accounts for both reasons.

The new evidence about the altercation at Comanche Park Apartments interlocks neatly with, and supplements, the trial evidence.  As previously discussed, Jefferson and Savage differently remembered many details of the altercation and only vaguely described most participants.  They testified that a fight ensued either when Freddie, surrounded by five of his homeboys, insulted Jefferson regarding past altercations over Sabrina Schrader (per Jefferson), or when Freddie and three or four other unidentified occupants of an SUV made "open statements" from "underneath the tree," statements possibly related to Jasper and Savage's discussion with them about the quality of marijuana Jasper and Savage offered for sale that Savage perceived as directed toward Savage (per Savage).  *See supra*, Discussion

section III.A.1.a.  But Jefferson and Savage were consistent in testifying that Jefferson drove Harris's red Dodge Intrepid to Comanche Park Apartments sometime after 10:00 p.m. on Friday, October 22, 2010, that a fight ensued with Freddie and other individuals, that Freddie fired a gun at the end of the altercation, and that Freddie ran from security officers.  *Id.*

Freddie, Porter, and Young (the latter of whom speaks about the altercation through the Tanner affidavit), provide accounts of the altercation that corroborate and supplement the accounts provided at trial by Jefferson and Savage.  Freddie, Porter, and Young all state that they participated in a fight with Savage, Jefferson, and Jasper at the apartment complex sometime after 10:00 p.m. on Thursday, October 21, 2010.[55]  *See supra*, Discussion section III.A.1.b.  Porter and Freddie state that the fight ensued because Jefferson drove recklessly through the parking lot, hit Porter's car door with her car door, and responded aggressively when Porter confronted her.  *Id.* Freddie and Young state that Jasper kicked Young in the face during the fight.  ECF No. 14-4 at 12, 16.  Freddie states that Jefferson tried to punch him, and he had Jefferson "down on the ground and got up off her."  *Id.* at 12.

---

[55] The Court further explores below the significance of the old evidence describing the altercation as occurring on the Friday before the shooting on North Harvard and the new evidence describing that same altercation as occurring on the Thursday before the shooting on North Harvard.  *See infra*, Discussion section III.B.2.b.

This is somewhat like Jefferson's account that Freddie approached her in the parking lot, swung and missed, she fell and got back up, and Freddie swung and missed again.  ECF No. 15-2 at 88.  And, like Savage, Freddie states that, at some point, Jefferson got into Harris's car and tried to run over Freddie.  ECF No. 14-4, at 12; ECF No. 15-2 at 195, 246-47.  Savage, Jefferson, Freddie, and Porter, all agree that the fight ended when someone fired a gun.  *See supra*, Discussion section III.A.1.  Jefferson, Savage and Freddie identify that person as Freddie but differently describe that he fired the gun into the air (Jefferson), into the ground (Savage), and at Jefferson as she tried to run Freddie over (Freddie).  *Id.*  Jefferson testified, and Freddie states, that Freddie ran from security officers (Jefferson) or police officers (Freddie) after he fired the gun, and that Freddie dropped the gun.  *Id.*

The new evidence about the shooting on North Harvard also interlocks well with some of the trial evidence, albeit not so well with the testimony from Savage and Jefferson identifying Smith as the shooter.  Jefferson, Savage, Jasper, and Harris initially described the shooter as an unknown black male, about six feet tall, wearing all black, including a black hoodie.  *See supra*, Discussion section III.A.2.a.ii.  Jasper stated he had been sitting on the porch when the shooter walked up to him; Jefferson stated she did not see the shooter; Savage stated he did not know the shooter.  *Id.*  At trial,

Jefferson and Savage identified Smith as the shooter but provided differing accounts of Smith's arrival and his interactions with Jefferson, Jasper, and Savage. *See supra*, Discussion section III.A.2.a.i. Smith either came over to question Jefferson about the fight with Freddie (Jefferson), or because Jasper called him over and Smith voiced concerns to Jasper and Savage about Jefferson being an informant (Savage). *Id.* Savage testified that Smith arrived sometime between 12:45 a.m. and 1:20 a.m., on Saturday, October 23, 2010. *Id.* Other testimony established that the shooting occurred sometime before 2:00 a.m. that same morning. *See supra*, Discussion section III.A.2.a.ii. Jefferson testified she was shot three times and heard seven shots while she was either standing on the porch or in the doorway and Smith was standing behind her on the grass in front of the porch. *See supra*, Discussion section III.A.2.a.i. Savage testified that, as he hid behind Harris's car, he saw Smith shoot both victims, heard Smith fire nine shots at Jefferson while aiming the gun at the house, and heard Smith fire five shots in Jasper's direction after Jasper ran from Smith. *Id.* Other evidence presented at trial established that two bullets struck the exterior of the front door frame and one struck an interior wall; that Jefferson was shot in the left arm and the left side, but possibly by fewer than two bullets, and most likely while she was walking through the doorway; and that Jasper was shot in the back, the back of his head, and his left hand and his right shoulder was grazed by a

bullet, and the gunshot wound to the hand could have been consistent with Jasper covering his head with his hand. *See supra*, Discussion section III.A.2.a.ii.

Freddie, Porter, and Young (the latter of whom speaks about the shooting through the Tanner and Thomas affidavits) state that they were with Young, Tanner, and other individuals at Comanche Park Apartments on the night of Friday, October 22, 2010; that Young left the group around 1:00 a.m.; that Young was upset about the fight with Jasper and that his face was bruised from the fight; that Young left in his girlfriend's car; and that Young met up with Porter, Freddie, Tanner at Porter's girlfriend's house around 3:00 a.m. *See supra*, Discussion section III.A.2.b.[56] Freddie states that Young, who was dressed in all black, acted "strange" when he arrived, removed his clothes and put them in a trash bag, took out a gun, and started wiping down the gun. ECF No. 14-4 at 12. Porter states that Young pulled him to the side, after Young arrived at Porter's girlfriend's house, and told Porter that he had just shot Jasper and Jefferson after he "caught them slipping in their yard, sitting around drinking." *Id.* at 14. Porter also states that Young told Porter

---

[56] Tanner does not mention in her affidavit that she was present with Porter, Freddie, and Young on the night of October 22, 2010. ECF No. 14-4 at 16-17. That somewhat lessens her credibility but not to such a degree that persuades this Court to entirely disregard Tanner's affidavit.

that he shot Jefferson when she tried "to run in the house," that Jasper "tried to run and [Young] hit him in the back and the back of his head," and that when Jasper "was on the ground, [Jasper] put his hands up to block his head" so Young "shot [Jasper] through his hands." *Id.* When Young later confessed to Tanner, Young told Tanner that he drove his girlfriend's car to Jasper's location at a residence, after he received a threatening phone call from Jasper, parked the car, walked across the street, and began shooting at three people standing in the yard drinking. *Id.* at 16. Young told Porter these were the three people involved in the fight at the apartment complex, that he shot Jefferson as she tried to run inside, that Savage hid underneath a car, and that he shot Jasper in the back of the head and hand while Jasper was on the ground. *Id.*

The Court recognizes that the interlocking nature of the new evidence with the old evidence simultaneously makes the new evidence credible and suspect. Anyone with access to the trial transcripts and anyone who attended Smith's trial theoretically could craft statements that conform to the trial evidence. But, as discussed next, the synergistic effect of the new evidence that corroborates and supplements the old and the manifest weaknesses in the State's case against Smith persuades this Court that a

reasonable juror confronted with the newly supplemented record more likely than not would have reasonable doubt about Smith's guilt.

### b. New evidence magnifies manifest weaknesses in the old.

As Respondent notes, a court must consider the strength of the evidence presented at trial when evaluating a gateway actual innocence claim:

> The Supreme Court instructs federal courts to examine the strength of the prosecution's case at trial when weighing the significance of all newly discovered evidence. *See House*, 547 U.S. at 539-553, 126 S. Ct. 2064 (assessing newly discovered evidence within the state's theory of the case at trial). The State's theory of the case shows what evidence is significant to the jury's determination of guilt. More importantly, the state's theory of the case demonstrates the strength of the case against a defendant.

*Fontenot*, 402 F. Supp. 3d at 1129-30. Respondent asserts that the State's case "relied upon" two eyewitnesses (Savage and Jefferson), Jasper's statement to his mother, and Smith's purported jailhouse confession to Savage. ECF No. 14 at 43.[57] Respondent describes this as "a persuasive body of evidence pointing to [Smith] as the killer" and characterizes the evidence of Smith's guilt as "overwhelming." *Id.* at 43-44. It is not clear to the Court, from Respondent's arguments or Respondent's recitation of the facts in the

---

[57] Intentionally or not, Respondent fails to mention that the jury also heard Detective Regalado's repeated statements, during Smith's videotaped interrogation of Smith and at trial, that Regalado was convinced that all the facts pointed to Smith as the shooter. *See supra*, Discussion section III.A.2.a.i; ECF No. 16 (State's Ex. 1).

Motion, that Respondent read the same trial record that the Court has reviewed. In any event, having carefully reviewed the trial record, the Court finds that the State's theory, or rather the State's struggle to identify a coherent one, demonstrates the weakness of its case against Smith. The Court further finds that the new evidence not only magnifies weaknesses in the State's case that are obvious from the trial record but also amplifies credibility issues of both eyewitnesses and provides a more plausible motive for the shooting and a more likely perpetrator.

As previously stated, the prosecutor announced the State's theory of the case to the jury in opening statements when it told the jury that the evidence would show that Jefferson, Jasper, and Savage went to Comanche Park Apartments "on October 22, 2010" and got into an argument with "Freddie Smith, Channen Smith's cousin." ECF No. 15-2 at 19. The fight "escalated and escalated with Freddie Smith pulling a pistol and shooting," police were called, Freddie "ran off," and Freddie "ultimately ended up picking up a case because of it, a weapons charge." *Id.* at 20. The prosecutor then told the jury that, "*a few hours later* . . . early morning hours of October 23rd, 2010, here comes Channen Ray Ozell Smith at 1843 North Harvard," accusing Jefferson and Jasper of "snitching on [his] cousin," and, ultimately, shooting both Jefferson and Jasper. *Id.* (emphasis added).

The prosecutor's statements that the shooting on North Harvard occurred in the "early morning hours" of October 23, 2010, and that Jefferson and Jasper were shot, are borne out by the evidence, both old and new. *See supra*, Discussion sections III.A.2, III.B.2.a. But the prosecutor's statement that the shooting occurred only "a few hours" after Jefferson's altercation with Freddie at Comanche Park Apartments is not, and the new evidence amplifies the prosecutor's mistaken (or misstated) timeline and severely undermines the persuasiveness of the State's tepid but arguably most plausible theory about Smith's alleged motive—i.e., that Smith shot Jefferson and his good friend Jasper because Jefferson allegedly snitched on Freddie.

Regarding the timeline, Savage and Jefferson both testified that the altercation with Freddie occurred after Savage, Jefferson, and Jasper drove to the apartment complex sometime after 10:00 p.m. on Friday, October 22, 2010; that the trio returned to Savage's house after the fight; that Jefferson returned to the apartment complex alone with a gun in the car; and that Jefferson was arrested, spent the night in jail, and bonded out the next morning. *See supra*, Discussion sections III.A.1.a, III.A.2.a.i. Savage and Jefferson each testified about the activities they engaged in throughout the day, after retrieving Harris's car from the apartment complex parking lot, and that they spent at least part of the evening drinking before the shooting

occurred on Saturday, October 23, 2010, at roughly 2:00 a.m.  *Id.*  The

problem with this timeline is that if the fight occurred sometime after 10:00

p.m. on Friday, October 22, 2010, Jefferson spent that night in jail and

returned home the next morning, and Jefferson and Savage engaged in

various activities throughout the day and evening, the shooting logically

would have occurred in the early morning hours of Sunday, October 24, 2010.

The prosecutor seemed to recognize this problem, partway through

Jefferson's testimony, after Jefferson testified she bonded out of jail, spent

the day resting, and spent a portion of the evening drinking before she heard

Smith walking up the driveway, because the prosecutor asked Jefferson,

"Now, at the time you heard him this night, October 22nd, 2010, going into

October 23rd, 2010, how long had you known Mr. Smith?"  ECF No. 15-2 at

100.  And, as previously discussed, after hearing testimony from all but one of

the state's witnesses, the trial court sought clarification from Detective

Regalado about when, exactly, the shooting occurred.  ECF No. 15-3 at 52-53.

Even granting the State the benefit of the doubt and assuming that the

only two living eyewitnesses to the shooting were mistaken when they

consistently testified that the fight with Freddie occurred on the night of

Friday, October 22, 2010, and what they really described was the same

altercation referenced in the new evidence as having occurred on the night of

Thursday, October 21, 2010,[58] a reasonable juror viewing the newly supplemented record might reasonably question whether Savage and Jefferson could have been mistaken about other important details.[59]

And even without the new evidence, the old evidence shows that the State's key witnesses suffered from serious credibility issues.  Because the State had no physical evidence connecting Smith to the shooting, the State's case against Smith was largely dependent on the testimony of Savage and

---

[58] As previously noted, *see supra* n.27, this Court has received a copy of a police report that appears to be authentic, and that appears to be a report referred to by defense counsel at trial, documenting Jefferson's arrest for gun possession after the fight with Freddie and showing that Jefferson was arrested on October 22, 2010, at 2:30 a.m. and was booked into the Tulsa County Jail at 3:51 a.m. that same morning.  ECF No. 20 at 38.  The timeline established by the new evidence, but not the old evidence, is consistent with this report.  Detective Regalado testified he was aware of Jefferson's arrest, but did not provide detailed testimony on this point.  ECF No. 15-3 at 40-41.

[59] Respondent asserts that the new evidence "facially comports with" the testimony of Smith's alibi witnesses.  ECF No. 14 at 41-42.  Respondent then appears to argue that the State's case was strengthened, in part, because the alibi witnesses could not recall specific dates and their testimony that Smith was in Claremore until Sunday did not align with Smith's statement to Detective Regalado that he returned to Tulsa on Saturday afternoon (which still would have been after the shooting).  *Id.*  Respondent is not wrong that Smith's alibi witnesses suffered from their own credibility issues.  *See supra*, Discussion section III.A.3.  In assessing the newly supplemented record, the Court finds that a reasonable juror might react the same as the original jurors did to the testimony of Smith's alibi witnesses. But, for purposes of evaluating the gateway actual innocence claim, the Court finds that any credibility issues of the alibi witnesses and any weaknesses in their testimony neither advance nor undermine that claim in light of the record as a whole.

Jefferson, two then-active gang members with prior felony convictions and pending felony charges, one of whom openly admitted at trial that he initially lied to police officers about the identity of the shooter after removing all of his illegally possessed firearms from his house (Savage), and one of whom openly testified at trial that she did not tell police officers anything about the shooting despite testimony from two police officers that said otherwise (Jefferson). *See supra*, Discussion sections III.A.1.a., III.A.2.a.i. In addition, as discussed *ad nauseum*, Savage and Jefferson gave inconsistent accounts regarding both the altercation at Comanche Park Apartments—an altercation that neither witness suggested Smith participated in but that (along with an allegedly already resolved four-month-old dispute over Sabrina Schrader) purportedly precipitated Smith's shooting of Jefferson and Jasper on North Harvard. *See supra*, Discussion sections III.A.1.a., III.A.2.a.i, III.B.2.a.

Further, the new evidence amplifies the weakness of the State's case against Smith. Even disregarding most of the inconsistencies in Jefferson's and Savage's testimony regarding the events leading up to the shooting and focusing solely on the testimony about Smith's arrival and the shooting itself, the newly supplemented record more likely than not would cause a reasonable juror to have reasonable doubt about Smith's guilt. Jefferson

testified that she went outside because she heard Smith talking about the fight with Freddie and saw Smith walking up the driveway, and that after she went outside Savage and Jasper both explained to Smith that Freddie had started the fight. *See supra*, Discussion section III.A.2.a.i. Savage testified that Jasper, Smith's good friend, invited Smith over with a phone call; that Smith spoke with Savage and Jasper, for nearly twenty minutes after his arrival, and before Jefferson came outside, about Smith's concern that Jefferson was an informant and that she had told on Two Piece and Big Mark (neither of whom are mentioned by anyone other than Savage). *Id.* Savage and Jefferson both testified that, at some point, and only after Jefferson brought it up, Smith mentioned a four-month-old dispute with Jefferson about Sabrina Schrader. *Id.* According to Savage, only the discussion of Schrader—not Smith's concern about Jefferson's status or actions as an informant—caused Smith's demeanor to change and caused Smith to become "confrontational." ECF No. 15-2 at 212.

Jefferson and Savage both testified that, immediately before the shooting, Jefferson offered to shake hands with Smith, but he instead cussed her out again before he began shooting at her. *Id.* at 115, 216. Jefferson—who by all accounts given at trial—was the target of Smith's rage (either based on Jefferson's snitching, the fight with Freddie, or the history with Schrader—or

maybe all three)—testified that she was standing "on the front porch," that she "turned around and took two steps into the house and ended up . . . shot three times" while Smith was standing directly behind her in the grass in front of the porch. *Id.* at 117-19. Savage also testified that Smith was standing near the front porch before the shooting began and that he shot first at Jefferson, firing "about" nine shots while he was aiming at the house. *Id.* at 217, 256. Even assuming Jefferson was hit by three separate bullets, Jefferson's wounds do not show that she was shot in her back. Rather, she had two gunshot wounds in her left arm and one in her left side, just above her rib cage. One bullet penetrated Jefferson's upper left arm and exited into her side chest area; she also had a through and through gunshot wound on her left forearm. ECF No. 15-5 at 41-44 (State's Exs. 42, 45, 46, 47).

Savage testified that Smith turned his attention to Jasper after Jasper asked Smith why he was shooting at Jefferson. ECF No. 15-2 at 217, 256. According to Savage, Jasper took off running, and Smith fired five shots in Jasper's direction. *Id.* Smith's accuracy improved with a moving target, and Jasper suffered four injuries: a "superficial" entrance wound on the back of the head caused by a projectile that traveled through the scalp but did not penetrate the skull; a graze wound on the right shoulder; an entrance wound on the lower back caused by a projectile that traveled through skin and soft

tissue, passed through the third lumbar vertebra, injured the bowel, and stopped in the right abdominal area; and an entrance wound on the backside of the left wrist caused by a projectile that passed out through the left palm. *Id.* at 55, 62- 67.  According to the medical examiner, the wound to Jasper's left wrist could have been caused by the same projectile that struck the back of his head.  *Id.* at 67-68.  Jasper's wounds, but not Jefferson's, proved to be fatal.

The new evidence comports with the physical evidence, aligns well with at least a portion of the eyewitness testimony, and arguably provides a more plausible motive for the shooting than any of the motives the State advanced at trial.  According to the new evidence, Young was involved in the fight at Comanche Park Apartments on Thursday night, and Jasper kicked Young in the face during the fight.  ECF No. 14-4 at 9-17.  Young, still bruised and upset about the beating he took from Jasper, hung out with Porter, Freddie and Tanner on Friday night at Comanche Park Apartments, and left the apartment complex driving his girlfriend's car around 1:00 a.m. on Saturday morning after receiving a threatening phone call from Jasper.  *Id.*  Young parked his car across the street from Savage's house, walked to the yard, saw Savage, Jefferson, and Jasper drinking, and began shooting.  *Id.*  He described shooting Jefferson as she ran inside the house and shooting Jasper,

i.e., the person who stomped Young's face on Thursday night, in the back while Jasper tried to run away and in the back of the head after Jasper was laying on the ground. *Id.* Both Jefferson and Savage testified that a vehicle was parked across the street, near the Dollar General, before the shooting; Jefferson was certain that vehicle was a car; Savage equivocated, first describing it as an SUV and later as a car. ECF No. 15-2 at 163-67, 213, 218, 254-55. Only Savage testified that Freddie got out of and into that SUV/car just before the shooting, and, despite Freddie's stated concerns, Freddie was never prosecuted for any role in the shooting on North Harvard.

Other than the questionable testimony from Jefferson and Savage, the State presented Phyllis's testimony that Jasper identified "Cross," a.k.a., Smith, as the shooter at the hospital; and Savage's testimony that Smith confessed his guilt to Savage on the first day of Smith's trial. *See supra*, Discussion section III.A.2.a.iii. The Court deals with this evidence only briefly because, even crediting Phyllis's testimony, it is not sufficiently weighty, standing alone, to undermine the credibility of Smith's gateway actual innocence claim. And, while the State and Smith stipulated at trial that Savage and Smith were placed in the same jail cell by "mistake," ECF No. 15-2 at 232-33, the Court finds that a reasonable juror confronted with the newly supplemented record and instructed to consider the credibility of

all witnesses would give little or no weight to Savage's testimony that Smith—who maintained his innocence throughout his interview with Detective Regalado and throughout his trial and presented an alibi defense— would decide on the first day of his jury trial that he should confess his guilt to a known prosecution witness after, according to Savage, the two men hugged and discussed "getting [their lives] right with God."  ECF No. 15-2 at 233-36; *see Schlup*, 513 U.S. at 330 (noting that a court assessing an actual innocence gateway claim may need "to make some credibility assessments").

## C. Conclusion

Based on the foregoing, and having carefully considered all evidence, old and new, the Court is persuaded that, "in light of the new evidence, no juror, acting reasonably, would have voted to find [Smith] guilty beyond a reasonable doubt."  *Schlup*, 513 U.S. at 329.  Smith's gateway actual innocence claim therefore excuses the procedural default of his *Napue* claim (claim one), the untimeliness of his ineffective assistance of appellate counsel claim (claim two), and the untimeliness of his *Brady* claim (claim three). However, for the reasons stated in Discussion section II.B, Smith's Indian country jurisdiction claim (claim four) not only is procedurally defaulted but also lacks merit.  The credibility of his gateway actual innocence claim does not support permitting him to proceed any further with claim four.

## *CONCLUSION*

The Court concludes that Respondent's Motion to Dismiss should be GRANTED in part, as to claim four and as to that portion of claim one that asserts a substantive actual innocence claim, and DENIED in part, as to the *Napue* claim (claim one), the ineffective assistance of appellate counsel claim (claim two), and the *Brady* claim (claim three). The Court thus directs Respondent to file a merits response brief, addressing the merits of the *Napue* claim (claim one), the ineffective assistance of appellate counsel claim (claim two), and the *Brady* claim (claim three), and permits Smith to file an optional reply brief.

**IT IS THEREFORE ORDERED** that Respondent's Motion to Dismiss [ECF No. 13] is GRANTED in part and DENIED in part.

**IT IS FURTHER ORDERED** Smith's Petition [ECF No. 1] is DENIED IN PART, as to claim four and as to that portion of claim one that asserts a substantive actual innocence claim. The Clerk of Court shall maintain the Petition as a pending motion until further order of this Court.

**IT IS FURTHER ORDERED** that Respondent shall file a merits response brief, addressing the merits of the *Napue* claim (claim one), the

ineffective assistance of appellate counsel claim (claim two), and the *Brady* claim (claim three), on or before May 5, 2025.

**IT IS FURTHER ORDERED** that Smith may file an optional reply brief, addressing the arguments in the response, on or before June 5, 2025.

**IT IS SO ORDERED** this 3rd day of April, 2025

_____
Sara E. Hill
UNITED STATES DISTRICT JUDGE